**STATE of Minnesota, Respondent,**

v.

**Donald Manfred CARLSON, Appellant.**

**No. 81–133.**

Supreme Court of Minnesota.

Dec. 23, 1982.

C. Paul Jones, Public Defender, and Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert W. Johnson, County Atty., and J. Diane Savage, Asst. County Atty., Anoka, for respondent.

Considered and decided by the court en banc without oral argument.

PETERSON, Justice.

Defendant, Donald Manfred Carlson, was convicted of second-degree murder of his wife, of third-degree felony murder of his son, and of aggravated assault on his sister-in-law. That defendant shot and killed his son and his wife and shot and wounded his sister-in-law is undisputed. On appeal, defendant raises issues that involve his insanity defense and alleged errors at trial.

Defendant and Joan Nelson met as children and dated as teenagers. Joan married Burke Nelson (no relation) in 1953. In 1954, defendant married another woman, and they had two daughters. At the same time, defendant and Joan continued an inti-

mate relationship; in 1960, while still married to Nelson, Joan had a son, Blake, by defendant. In 1972, Joan divorced Nelson, and she and Blake moved in with defendant. Joan and defendant were married in 1973. Blake had been informed of his parentage when he was about 10 years old. Defendant wished to adopt Blake, but Blake did not wish to be adopted. By May 1978, Blake did not want to see defendant.

Joan and Blake left defendant in March 1978 and went to live with Joan's parents. Joan filed for divorce, which would have been final 1 week after the shooting, and obtained a restraining order to keep defendant away. Defendant did not favor the divorce and about 10 days before the shooting violently pulled Joan out of a car in which she was riding so he could talk about it.

Defendant's relationship to Blake was seldom good. He believed Joan did not discipline Blake and felt she interfered with his attempts to do so. On one occasion Blake parked his car in the driveway; defendant did not like it and used his own car to push Blake's car sideways off the driveway. Another time, Blake damaged defendant's stereo. Defendant felt it was done deliberately; he took a meat cleaver and smashed the windows in Blake's car. Defendant told numerous persons he believed Joan and Blake were having an incestuous relationship and told the same story to the experts who examined him. Between 1974 and 1978, there were other incidents, which need not be recounted here, of unusual behavior by defendant.

The shootings occurred about 9 p.m. on August 7, 1978. There was extensive testimony as to how defendant spent that day. Defendant resided in a house which he shared with John Fosse and Fosse's two sons and which was located only a few houses away from a cabin owned by Glenn and Gloria Nelson, Joan's brother and sister-in-law. At 11 a.m., defendant telephoned a bank trust officer. He was angry with Joan because he felt she had taken money, which was his, from a bank account. However, the trust officer testified that

defendant "was rational and intelligent and seemed to be completely in control of his emotions."

At 5 p.m., defendant called a neighbor and told her he believed Joan had a boyfriend and that he believed Joan might go back to her ex-husband. About 7 p.m., as Fosse was leaving the house, defendant was watching Joan, who was at the Nelson cabin, with his binoculars; he stated, "[Y]es, Joan's down there again. Why doesn't she leave me alone?"

Defendant then opened a fifth of 160-proof vodka and began drinking "screwdrivers." By 9 p.m., he had nearly consumed the whole fifth. His blood alcohol level was later estimated to have been 0.135. As he drank, defendant watched the Nelsons through the binoculars. They and Joan were preparing a late dinner for themselves, their children (including Blake), and several teenage friends. According to a taped statement which defendant later gave to police investigators, defendant began to think about Blake and his "absolute defiance," and "the more I watched, the madder I got." He also remembered the restraining order Joan obtained against him. In his words, "I felt bad, I felt hurt, and I felt defiance, and I thought, you know, I just got, you know, hurt and mad." Defendant took a shotgun and revolver, loaded them, and put more shells in his pockets. He drove to a driveway next to the Nelsons and parked there so that no one would see him.

He then walked to the screen porch, saw Blake, and pointed the gun at Blake's head, still feeling "hurt and defiance." Apparently no one saw defendant until he fired the shotgun. The first shot hit Blake squarely in the neck, and he died within minutes. As Joan ran to Blake, defendant fired a second shot, which hit her in the neck, severing her spinal cord. A third shot hit a chair behind her. All three shots were fired within 5 seconds. The persons in the house fled in several directions; Gloria Nelson hid in the kitchen. Defendant dropped the shotgun on the lawn and entered the room. He shot Joan in the back of the head

with the revolver from a distance of 2 feet. The telephone rang in the kitchen next to Gloria Nelson; it was a neighbor who had heard the shots. Gloria told her to call ambulances. As Gloria hung up, defendant saw her and fired twice, hitting her in the left chest and shoulder. He then left the house.

While the police were en route to the scene, defendant flagged them down, pointed to the scene, and told them, "There's a crazy black man with a shotgun who just shot two people. He's crazy. You've got to get him." Although he smelled slightly of alcohol, he appeared normal to the officers, who proceeded to the house, where Glenn Nelson told them defendant fired the shots. The police took defendant into custody the following morning. He entered pleas of not guilty and not guilty by reason of mental illness to all charges.

■■■ 1. Appellant's major attack on the verdict is that there was not sufficient evidence to support the jury's rejection of the mental illness defense. This contention fails in light of the established rule that defendant bears the burden of proving mental illness. *State v. Carpenter,* 282 N.W.2d 910, 914 (Minn.1979).

At trial, in addition to the lay witness testimony described above, the defense called three expert witnesses to testify as to defendant's mental state: Dr. Robert Jeub interpreted two electroencephalograms (EEG's), one performed in the usual manner and one performed after defendant had ingested 6 ounces of vodka. Results of the first EEG were normal. The alcohol-activated EEG showed a "mitten pattern," which has been found in "a certain percentage of patients who suffer mental illness." Although Dr. Jeub stated that the mitten pattern is "commonly associated" with mental illness, he admitted, on cross-examination, that it is not always so associated. He did not express any conclusions as to whether defendant was *M'Naghten* mentally ill.

Mr. Don Anderson, a clinical psychologist, gave several psychological tests to defendant. Mr. Anderson concluded that defendant was suffering some effects of alcohol abuse, that he was somewhat delusional, and that he was mentally ill from the time he believed his wife and son engaged in incest. Mr. Anderson believed defendant was not aware of the nature of his act and did not consider the rightness or wrongness of the act. He did note that defendant recalled his actions before and after the shootings in substantial detail.

Finally, Dr. Carl Schwartz, a psychiatrist, testified that defendant was "totally psychotic," based on his delusions of being a Marine on a mission. Dr. Schwartz described defendant with these words: "paranoid loser," "perfectionist," "obsessive compulsive," "deep-seated inferiority complex." As to the *M'Naghten* test, defendant knew that he had a gun and bullets and was killing, but he did not consider his act to be murder. "He did not believe it was wrong. He did not have the ability to know the difference, because of his mental condition at the time."

On rebuttal, the prosecution called four expert witnesses. The first expert witness was Dr. Bruce Norback, a neurologist. He had interpreted 18,000–20,000 EEG's but had never seen an alcohol-activated EEG. In his view, both EEG's were normal, given the effects of some subsequent drowsiness due to alcohol ingestion. Dr. Norback did not discuss *M'Naghten.*

Dr. Dennis Philander, a psychiatrist, testified that defendant's actions were not controlled by any delusions. Dr. Philander described defendant as "obsessive, compulsive," "perfectionist," and "episode alcoholic," and "in a state of depression." According to Dr. Philander, "[Defendant] knew full well what he was doing and the effect it would have on the intended victims. Now, with regard to the wrongfulness of his conduct, it would appear that defendant had a very definite legal, as well as moral appreciation of how wrong it was what he had done." The latter conclusion was bolstered by noting that defendant stated the act was a "no-no" and took steps to avoid apprehension.

Dr. Carl Malmquist, a psychiatrist, testified that defendant had abused alcohol for at least 20 years, was intoxicated on the night of the shootings, and suffered from a narcissistic personality disorder which exaggerated his need for approval and self-esteem. Defendant intended to kill himself along with his wife; he thought he would be killed in a shootout with deputies. Defendant did know the nature of his acts and their consequences but probably never considered their rightness or wrongness.

Finally, the prosecution called Dr. Terry Zuehlke, a clinical psychologist, who testified as to numerous psychological tests administered to defendant. Dr. Zuehlke diagnosed defendant as a "paranoid personality," not mentally ill. He concluded that defendant "knew what he was doing, and he knew that it was wrong."

Both Drs. Philander and Zuehlke testified that defendant knew what he was doing and that it was wrong. Although defendant's experts testified that he was mentally ill, it is up to the jury to decide which experts are more credible. Furthermore, most of the lay witnesses testified that defendant appeared completely normal on the day in question. On this evidence, the jury was not compelled to accept the mental illness defense.

2. Defendant requested that the jury be given instructions for felony murder and depraved mind third-degree murder. The trial court refused to charge the jury as to the latter after determining that defendant intended to shoot the particular victims who were shot. Defendant argues that this refusal deprived him of a fair trial, because, in effect, the trial court was resolving the issue of intent instead of leaving it to the jury.

"The trial court should submit instruction on a lesser degree of homicide to the jury if the evidence reasonably supports a conviction of the lesser degree and at the same time supports a finding of not guilty of the greater offense." *State v. Wahlberg*, 296 N.W.2d 408, 417 (Minn.1980); *accord, State v. Leinweber*, 303 Minn. 414, 228 N.W.2d 120 (1975).

■ There was overwhelming evidence that defendant was specifically seeking Blake, Joan, and—after she answered the telephone—Gloria; he did not harm any of the five other bystanders. Defendant did not argue at trial that he went on a sudden random shooting spree, and the trial judge correctly determined defendant's attacks were specifically directed against particular victims. A depraved mind instruction would therefore have been inappropriate, since the depraved mind statute [1] "was intended to cover cases where the reckless or wanton acts of the accused were committed without special regard to their effect on any particular person or persons; the act must be committed without a special design upon the particular person or persons with whose murder the accused is charged." *Wahlberg, supra,* 296 N.W.2d at 417 (citations omitted).

■ 3. At trial, defendant requested the trial judge to charge the jury in accordance with the ALI Model Penal Code standard.[2] According to defendant, the court in *State v. Rawland,* 294 Minn. 17, 199 N.W.2d 774 (1972), construed the mental illness defense so as to mandate that the factfinder is to consider volition and capacity to control behavior. Defendant argues that the Model Penal Code instruction incorporates these facts and thus should have been given. However, in *State v. Larson,* 281 N.W.2d 481 (Minn.1979), *cert. denied,* 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979), we explicitly held that an instruction on capaci-

1. Minn.Stat. § 609.195 (1980) provides:
   Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree * * *:
   (1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life; * * *.

2. Model Penal Code § 4.01 (Final Draft, 1962) reads as follows:
   (1) A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

ty to control behavior need not be given, and recommended use of the jury instruction that the trial judge used in defendant's case. The Model Penal Code instruction has not been adopted in this state.

4. The jury was given verdict forms which began: "We the jury impanelled and sworn to try the guilt or innocence of the above-named Defendant * * *." Defendant argues that the words "or innocence" unconstitutionally shifted the burden of proof onto him and deprived him of a fair trial.

■ Although in *State v. Brouillette,* 286 N.W.2d 702 (Minn.1979), we stated our disapproval of such verdict forms, we upheld the conviction because—as in this case—the instructions *as a whole* were not confusing where the trial court had twice correctly instructed the jury on the presumption of innocence and that the state had the burden of proving defendant's guilt beyond a reasonable doubt. 286 N.W.2d 708–09. The words "or innocence" in the verdict forms are not sufficient reason to overturn defendant's conviction.

5. During defendant's trial, the prosecutor requested permission to call Dr. Norback as an expert witness, despite not having disclosed his name to defense counsel. The prosecutor noted that on the previous day the defense had called Dr. Jeub to testify about the EEG's. The prosecutor said he learned for the first time during the afternoon, following Dr. Jeub's testimony, that Dr. Norback had also seen the EEG's and had written a report on them. The defense protested, arguing that calling Dr. Norback was a complete surprise and that the prosecutor should have discovered Dr. Norback's existence earlier. The court ruled Dr. Norback would be allowed to testify, because the prosecutor had just learned of his evidence. On appeal, defendant attacks this ruling as an abuse of discretion.

The relevant disclosure requirements are contained in Minn.R.Crim.P. 9.01, subd.

1(1)(a), and 9.03, subd. 2(a), which provide as follows:

The prosecuting attorney shall disclose to defense counsel the names and addresses of the persons whom he intends to call as witnesses at the trial * * *.

If subsequent to compliance with any discovery rule or order, a party discovers additional material, information or witnesses subject to disclosure, he shall *promptly notify* the other party of the existence of the additional material or information and the identity of the witnesses.

(Emphasis added).

■ The issue is best resolved by a straightforward application of the language of Rule 9.03, subd. 2(a): the prosecutor before trial had disclosed all witnesses of whom he had knowledge, and as soon as he discovered a new witness, he disclosed it to defendant. If defendant was indeed surprised or prejudiced, the proper response would have been to move for a continuance.[3] While from defendant's viewpoint it may be unfortunate that the prosecutor did not know of Dr. Norback's existence until August 12, that lack of information was not the fault of the prosecutor, and the cases involving punishment for violation of disclosure rules are therefore inapplicable. Although defendant argues he might have asked Dr. Jeub more detailed or different questions had he known Dr. Norback would testify, defendant never requested that he be allowed to recall Dr. Jeub following Dr. Norback's testimony. We hold that the trial court acted within its discretion in allowing Dr. Norback to testify.

6. Immediately after defendant was taken into custody on the morning after the shootings, he was interviewed by two police investigators; they then taped a statement from defendant with his full knowledge. At the start of each session, defendant was given full *Miranda* warning. He then discussed his actions in detail. After the in-

---

3. As the state's brief points out, there is good reason to believe that Dr. Norback's testimony was not prejudicial, because neither he nor Dr.

Jeub testified as to whether defendant was *M'Naghten* mentally ill.

terview and taping was completed, a transcript of the tape was made. Defendant refused to sign the statement. Copies of the statement and the tape were made and given to defendant, as required by Minn. Stat. § 611.033 (1978).[4] The police then requested him to sign a receipt for the tape but, at that time, did not inform him of his right to counsel. Defendant signed the receipt. The tape was played to the jury. Defendant now argues that failure to give him a *Miranda* warning at the time the receipt was requested denied him his right to counsel and requires reversal of his conviction.[5]

 Several alternative reasons support rejection of this argument. First, before defendant began his taped statement, he made a broad waiver of his *Miranda* rights, including his right to counsel. This waiver was sufficient to cover signature of the receipt as well. Secondly, it appears that defendant was not prejudiced by admission of the statement, because under *State v. Shaw,* 264 N.W.2d 397 (Minn.1978), had no copy of the tape been given to defendant (so that its use as evidence would be barred by the statute), the police could still refresh their memories by use of the tape and testify as to what defendant stated. Thus, the information would have reached the jury in one way or another. Thirdly, the purpose of Minn.Stat. § 611.033 is to require that defendants receive a copy of their statements from the police. There is no dispute but that defendant did receive a copy. Defendant apparently argues that had he refused to sign the receipt, the evidence would have been inadmissible; had counsel been present, defendant would not have signed the receipt and, consequently, the absence of counsel allowed otherwise inad-

missible evidence to be used against him. This syllogism is clearly wrong, because its major premise is wrong: no case law supports defendant's view that he could refuse to give a receipt and thereby exclude his freely given statement from evidence. The purpose of the statute is satisfied where defendant in fact received a copy of his statement. For these reasons, defendant's right to counsel argument should be rejected.

Affirmed.

---

4. In 1978, Minn.Stat. § 611.033 provided:

No statement, confession, or admission in writing shall be received in evidence in any criminal proceeding against any defendant unless at the time of the taking thereof such defendant shall have been furnished with a copy thereof and which statement, confession, or admission shall have endorsed thereon or attached thereto the receipt of the accused which shall state that a copy thereof has been received by him.

5. Defendant also argues that since he had a lawyer, the Code of Professional Responsibility required the police to address any statements to him through his counsel. Defendant points to no evidence in the transcript that the police had any such knowledge. Furthermore, there is no indication that either of the investigators who interviewed defendant were lawyers.