**STATE of Minnesota, Respondent,**

v.

**Guy Phillip JACKMAN, Appellant.**

No. C9–85–2154.

Supreme Court of Minnesota.

Nov. 14, 1986.

C. Paul Jones, Public Defender, Ann Remington, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Johnson, Hennepin Co. Atty., Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

AMDAHL, Chief Justice.

Appellant Guy Phillip Jackman appeals from his conviction for first-degree murder in the brutal-slaying of Thomas Kohrt on the morning of July 21, 1984. In Part I of a bifurcated trial the jury found that the elements of the offense had been proved and, in Part II, determined that appellant was not mentally ill.[1] He was sentenced to life imprisonment. We affirm.

After work on July 20, 1984, , appellant purchased an amphetamine commonly known as "crank," a stimulant that counters the effects of alcohol induced sleepiness. He then went home, ate dinner, drank one or two beers and snorted crank. He then visited various bars along Washington Avenue starting about 7:30 that night. At the first bar he had three whiskey and waters, and snorted the rest of the crank. At another bar he had one drink. At a third bar he had two drinks. Appellant went to a fourth bar, but did not drink there. Appellant next went to Archie's Bunker Bar, arriving between 11 p.m. and midnight. He had bad memories of that bar because he had gotten in a fight there.

From that point, appellant indicated his memory of the events was unclear. However, witnesses at the bar testified about appellant's actions at the bar before, during and after the shooting. John Cosgrove, a bartender at Archie's Bunker Bar, recognized appellant as an acquaintance and served him a beer. Appellant then went to play pool. While waiting to play, he began conversing with Deborah Fox. He spoke with Fox for 15 to 20 minutes before starting to play pool, and he also spoke to her when he was not shooting.

---

1. Appellant did not testify at trial. His version of the events was presented through the testimony of the court-appointed psychiatrist, Dr. Carl Malmquist, based on his interview of the appellant.

Appellant asked Fox if she knew where to get more crank and told her that he had done some and was "coming down." Fox testified that appellant looked tired but did not appear drunk. She also stated that her conversation with appellant was strange and that he was "bug-eyed."

Jeanne Johnston, a friend of Fox, played four games of pool with appellant that night. Johnston was an accomplished player who had played professionally. She testified that appellant played fairly well. She noticed a quirk in appellant's speech but did not think his speech was slurred.

After one of the games between Johnston and appellant, appellant had a dispute with Scott Peters, a bar patron, over who had the right to use the pool table next. Peters noticed nothing unusual about appellant, and the dispute quickly ended.

Between 12:35 a.m. and 12:45 a.m., Daniel Phillipps, a bouncer at the bar, announced to the players that they were playing their last game before he shut down the tables. Johnston and appellant were playing against each other, and when Johnston made the eight ball to finish the game, Phillipps turned out the light above their pool table. Instead of quitting, appellant put money in the table, turned the light back on and racked the balls for one more game. Phillips immediately came to the table and began pushing the pool balls into the pockets. Appellant asked about the 50 cents he had spent for another game, and Phillipps told him, "You lost it, buddy." Appellant became angry, so Phillips told appellant he could get his money back at the bar. Appellant, still angry, told Phillipps he was "fucking around with the wrong guy." Thomas Kohrt, another bouncer, came over in response to the shouting and tried to calm the situation; however, appellant recalled Kohrt shouting an obscenity back at him. Appellant continued to shout obscenities at both bouncers and repeated the same statement he had made to Phillips. Appellant then walked quickly out of the bar, followed by the bouncers. Phillips followed appellant until he was out of sight outside the bar.

Bartender Michael Godfrey was outside in the back of the bar around closing time when he saw a person in a Chevrolet Blazer hurriedly leave the parking lot and almost run over Godfrey's motorcycle.

Appellant returned to the bar approximately 15 minutes after leaving. As he entered the bar, appellant bumped into Scott Peters, who was leaving. Thomas Kohrt was standing near the doorway. Appellant immediately fired upon the bouncer with a .12–gauge shotgun. Several witnesses testified they heard a loud bang, and when they turned toward the sound, saw appellant holding a shotgun. After the first shot, Kohrt bounced off one bar patron's shoulder and reeled backwards to the floor. Appellant fired a total of four shots at and into the victim before running out the front door. Several witnesses testified that there was a gap between shots; others thought the pause was between the first and second shots, while still other witnesses recalled a pause between the second and third shots.

The pathologist in charge of the autopsy testified that all four shots were from within 10 feet of the victim. The angles of the four wounds were consistent with testimony that appellant shot Kohrt once while both were standing, and three times while standing over the fallen victim.

Although several people were standing near the doorway and some were spattered by blood, no one else was injured. Scott Peters saw appellant leave the bar carrying a shotgun. Peters followed until appellant ran across railroad tracks behind the bar.

Daniel Phillipps had run out the back door of the bar after the shooting and saw appellant leaving carrying a gun.

Derill Habiak testified at trial that he saw appellant running behind the building after the shooting. Habiak ran up to Washington Avenue, where he spotted a white topped, red bottomed truck driving away from the bar towards downtown on Washington Avenue.

Bartender Michael Godfrey was outside in back of the bar after the shooting when

he saw a man standing in the shadows of a truck, holding a gun. He ran up to Washington Avenue where he saw a red and white Chevrolet Blazer drive by. Godfrey recognized the Chevrolet Blazer as the same vehicle which had almost run over his motorcycle 15 minutes earlier.

Police later discovered that appellant had owned a red and white 1973 Chevrolet Blazer, and that he had sold it 8 days after the shooting. Police executed a search warrant on appellant's residence and found a sales slip for a shotgun purchased by appellant's mother. Appellant's mother testified that she bought the weapon for her son, since he could not buy the weapon himself. Appellant was arrested August 8, 1984.

In Part I of the trial, the court denied appellant's request to introduce psychiatric testimony relating to premeditation and intent and the defense produced no other witnesses. The jury found the state had proved the elements for first- and second-degree murder.

In Part II of the trial, Dr. Carl Malmquist, the court-appointed psychiatrist, testified as to appellant's mental capacity at the time of the shooting. The jury returned a verdict finding appellant guilty of first- and second-degree murder. The trial court sentenced appellant to life imprisonment and denied appellant's post-verdict motions for relief. Jackman raises the following issues on appeal:

I. Whether the trial court denied appellant due process by bifurcating the trial.

II. Whether the trial court denied appellant due process by not allowing psychiatric testimony relating to premeditation and intent.

III. Whether the trial court improperly refused to give third-degree murder instructions.

IV. Whether the evidence was sufficient to support the jury verdict for first-degree murder.

V. Whether appellant failed to prove by a preponderance of the evidence that he was mentally ill at the time of the shooting.

## I. *Bifurcated Trial.*

At a pretrial hearing, appellant entered a single plea of not guilty by reason of mental illness in an attempt to obtain a unitary trial proceeding. Appellant emphasized he was not admitting the elements of the crime and intended to require the state to prove the charges beyond a reasonable doubt. The trial court entered a plea of not guilty for appellant in addition to the plea of not guilty by reason of mental illness.[2] The trial court also ruled that the trial would proceed using the bifurcated trial process. Appellant argues that the trial court erred because the bifurcated procedure is required only where a defendant has pleaded both not guilty and not guilty by reason of mental illness, and was not appropriate in the present case because appellant made only a single plea.

Prior to August 1, 1983, a defendant had an election of whether the defenses of not guilty and not guilty by reason of insanity would be tried together, or whether the defenses would be bifurcated and tried separately. This choice was provided under Minn.R.Crim.P. 20.02, subd. 6(2), which stated:

*Defendant's Election.* If a defendant notifies the prosecuting attorney * * * of his intention to rely on the defense of mental illness or mental deficiency together with a defense of not guilty, * * * the defendant shall elect:

(1) Whether there shall be a separation of the two defenses with a sequential order of proof before the court or jury in a continuous trial in which the defense of not guilty shall be heard

---

**2.** The trial court did not expressly cite authority for its ruling, but it appears the court relied on Minn.R.Crim.P. 14.02, subd. 4, which states: "If the defendant stands mute or refuses to plead, or if the court refuses to accept a plea of guilty, the court shall proceed as if the defendant had entered a plea of not guilty."

and determined first, and then the defense of the defendant's mental illness or deficiency; or

(2) Whether the two defenses shall be tried and submitted together to the court or jury.

In *State v. Hoffman*, 328 N.W.2d 709 (Minn.1982), this court outlined a procedure to follow under the former rules when a "defendant has entered a plea of not guilty by reason of mental illness, but has not elected to bifurcate the trial." *Id.* at 716–17.

The Rules of Criminal Procedure were amended effective August 1, 1983, to completely delete subdivision 6(2), as cited above. In its place, Minn.R.Crim.P. 20.02, subd. 6(2) now reads:

> Separate Trial of Defenses. If a defendant notifies the prosecuting attorney * * of his intention to rely on the defense of mental illness or mental deficiency together with a defense of not guilty, * * there *shall* be a separation of the two defenses with a sequential order of proof before the court or jury in a continuous trial in which the defense of not guilty shall be heard and determined first, and then the defense of the defendant's mental illness or deficiency. [emphasis added]

Minn.R.Crim.P. 20.02, subd. 6(4), indicates that under the bifurcated procedure, if the elements of the offense are not proved beyond a reasonable doubt in phase I of the trial, the defendant is entitled to acquittal. If the elements of the crime are proved, the defense of mental illness or deficiency is then tried. This court has recognized the change to the rules. In *State v. Bouwman*, 354 N.W.2d 1 (Minn.1984), the court reviewed a case conducted under the previous Rule 20.02 allowing for a unitary trial. The court noted, "Rule 20.02, subd. 6(2) of the Minnesota Rules of Criminal Procedure (effective August 1, 1983) now, however, *mandates* a bifurcated trial when a defendant relies on a defense of not guilty and of mental illness or mental deficiency." *Id.* at 5n. 2 (emphasis added).

Similarly, in *State v. Spurgin*, 358 N.W.2d 648 (Minn.1984), we rejected appellant's argument that he was improperly denied bifurcation after he had chosen a unitary trial and the trial court had proceeded midway through the unitary procedure. The court noted under the specific facts of that case, where defendant had pleaded both defenses: "Under the present rules of criminal procedure, this position would never have arisen. Bifurcation is now required in all· cases where mental illness and guilt or innocence are both pleaded by a defendant." *Id.* at 650.

Appellant argues that because he did not affirmatively plead not guilty and not guilty by reason of mental illness, he was entitled to a unitary trial as described in *Hoffman*. His argument is not persuasive. The comment to the rules addresses the exact issue presented by appellant. It states:

> If * * * the defendant intends to rely on the defense of mental illness or mental deficiency and the defense that he is not guilty of the elements of the offense charged * * * there must be a separation of the two defenses for trial [citations omitted]. The mandatory separation of the two defenses for trial under this rule makes it unnecessary to use the procedures outlined in *State v. Hoffman*, 328 N.W.2d 709 (Minn.1982).

Minn.R.Crim.P. 20.03 comment; *see also Minnesota Practice: Jury Instruction Guides* CRIMJIG 6.01 comment ("new rule, mandating a bifurcated trial, makes unnecessary the use of the procedures outlined in *State v. Hoffman* * * *."). Were we to interpret the rules as suggested by appellant, we would be providing a defendant with the opportunity to choose a unitary or bifurcated trial simply by withholding his plea of guilty or not guilty. The rules were amended to eliminate that very choice. Mandatory bifurcation promotes the policy goals of excluding psychiatric testimony regarding intent, *see State v. Bouwman*, 328 N.W.2d 703, 705 (Minn. 1982) (psychiatric evidence is of no value in determining intent because it does not relate to physical evidence upon which jury is

to determine intent issue), and obviates objections to admissibility at trial of self-incriminating statements made by defendant in the compulsory mental examination, *State v. Spurgin*, 358 N.W.2d 648, 650–51 (Minn.1984).

■ We hold that a bifurcated trial is required where the defendant does not admit the elements of the crime and also relies on the defense of mental illness or deficiency, regardless of whether defendant affirmatively pleads to both issues. A careful reading of the rules indicates that Minn.R.Crim.P. 9.02, subd. 1(3), directs that "[i]f the defendant gives notice that he intends to rely on the defense of mental illness or mental deficiency he shall also notify the prosecuting attorney whether he also intends to rely on the defense of not guilty." If the defendant intends to rely on both defenses, then Minn.R.Crim.P. 20.-02, subd. 6, mandates bifurcation of the trial.

■ If a defendant enters a single plea of not guilty by reason of mental illness or deficiency and refuses to plead as to the elements of the crime, Minn.R.Crim.P. 14.-02, subd. 4, authorizes the trial court to enter a plea of not guilty for the defendant. The entry of a plea of not guilty by reason of mental illness is not a plea to, nor does it controvert or admit, the state's allegations that an offense has been committed and that the defendant committed it. The trial court decision to enter a plea of not guilty for appellant and to bifurcate the trial was proper.

II. *Exclusion of Psychiatric Testimony Relating to Intent.*

■ Appellant argues that the trial court denied him due process by refusing to allow an expert to present psychiatric testimony relating to premeditation and intent. Appellant specifically argues that the United States Supreme Court case of *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), prohibits the court from allowing the state to present expert witness testimony on issues while barring appellant from presenting expert testimo-

ny. Appellant cites to *State v. Hitch*, 356 N.W.2d 820 (Minn.App.1984), which upheld a trial court ruling allowing an expert to testify in a criminal sexual conduct trial as to complainant's ability to appraise the nature of her conduct. Appellant asserts that because the state was able to present an expert in *Hitch*, he should have been permitted to present experts to testify as to intent and premeditation. His argument is without merit.

In *Hitch*, the issue was whether complainant was capable of understanding her conduct; it did not involve the distinct, separate issues of premeditation and intent, as in the present case. The issue of complainant's capacity in *Hitch* is more analogous to the issue of sanity, where expert testimony is relevant. This court explained the distinction in *State v. Bouwman*, 328 N.W.2d at 705:

> [I]t is essential that we differentiate between intent as a fact issue from the question of the mental capacity of the defendant. * * * [J]urors, relying on their sensory perceptions, experiences in life, and their common sense, consider the manifestations of the defendant's conduct and determine if the defendant formed the specific intent to do what he did. The defendant has the right to offer evidence which disputes the physical facts upon which the inference of the fact of intent is sought to be established by the prosecution. However, psychiatric evidence is of no value at this part of the trial since it does not relate to the physical evidence upon which the jury is to determine the issue of intent. * * * When, however, the insanity defense is asserted, the inquiry shifts to a different dimension. * * * On this issue of capacity, expert psychiatric testimony has probative value.

We hold that the trial court properly rejected appellant's request to have psychiatric testimony admitted on the issues of intent and premeditation, and that appellant was not denied due process.

### III. Third-Degree Murder Instructions.

Appellant's assertion that the trial court erred by refusing to give third-degree murder instructions to the jury is without merit. We have previously stated that Minn. Stat. § 609.195 (1984), which defines third-degree murder, was intended to cover reckless or wanton acts committed without regard to their effect on particular persons. *State v. Wahlberg,* 296 N.W.2d 408, 417 (Minn.1980). Our previous decision in *State v. Carlson,* 328 N.W.2d 690 (Minn. 1982), is directly on point. In *Carlson,* the defendant went to his in-laws' house where his estranged wife and her son from a previous marriage were staying. Defendant shot his wife, her son and his wife's sister-in-law who tried to call for help. Defendant did not attempt to shoot anyone else. On appeal, this court affirmed the trial court's refusal to instruct on third-degree murder. We found overwhelming evidence that defendant specifically sought out his wife, her son and the sister-in-law who called for assistance, and noted defendant did not harm any bystanders. *Id.* at 694.

In the present case, appellant walked into the bar and fired a .12–gauge shotgun four times. The only person hit was Thomas Kohrt, despite the fact others were close enough to be spattered with blood. The evidence is overwhelming that appellant intended to specifically shoot Kohrt. The trial court therefore properly rejected the request for third-degree murder instructions.

### IV. First-Degree Murder Sufficiency of Evidence.

Appellant argues that the evidence at trial was insufficient to establish guilt for first-degree murder. In determining whether there was sufficient evidence to support the jury verdict, this court views the evidence in the light most favorable to the verdict. *State v. Spurgin,* 358 N.W.2d 648, 651 (Minn.1984); *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978).

On appeal, appellant does not dispute the fact he shot Kohrt. The sole issue is whether the evidence supports a finding of intent and premeditation. Minn.Stat. § 609.18 (1984) defines "premeditation" as: "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Appellant argues that the 15 minutes between when he left the bar and when he returned were insufficient to allow him to form intent and premeditation. We have stated, however, that extensive planning and deliberation are not required; premeditation and intent may be formed "virtually instantaneously." *State v. Neumann,* 262 N.W.2d 426, 430 (Minn. 1978).

We find sufficient evidence to support the jury verdict. Appellant had threatened both bouncers prior to going to get and returning to the bar with the shotgun. When appellant entered the bar, he did not shoot randomly, he shot only at Kohrt. These circumstances alone support a finding of premeditation. The finding of intent and premeditation is also supported by testimony indicating that appellant moved toward the victim during successive shots and that there was a pause between shots. *See State v. Hare,* 278 Minn. 405, 408, 154 N.W.2d 820, 822 (1967), *cert. denied,* 391 U.S. 925, 88 S.Ct. 1823, 20 L.Ed.2d 663 (1968) (aiming loaded gun and firing multiple shots, all which strike target, permits inference of premeditation and intent to kill).

### V. Mental Illness Defense.

Appellant argues that the evidence presented in Part II of the trial was sufficient to prove by a fair preponderance of the evidence that appellant was not guilty by reason of mental illness. This court reviews evidence concerning a defendant's sanity in the light most favorable to the verdict. *State v. Bouwman,* 354 N.W.2d 1, 4 (Minn.1984). Defendant has the burden of proving insanity by a preponderance of the evidence. *State v. Linder,* 304 N.W.2d 902, 907 (Minn.1981).

In the second part of the bifurcated trial, the only witness was Dr. Carl Malmquist, the court-appointed psychiatrist. He reviewed the statements of witnesses and officers connected with the shooting, reviewed a psychological test given to appellant, and spoke with appellant.

■ With respect to the night of the shooting, Dr. Malmquist testified on direct examination that appellant suffered from a "depersonalization disorder," causing him to have a split personality, and that appellant was also intoxicated. Dr. Malmquist explained appellant's thought processes as follows:

In that sense, you've got a two-track kind of thinking process going on, and that's what I think happened with Mr. Jackman. As he's walking along, part of him is saying, "Guy what are you doing, slow down," indicating there is some cognitive functioning going on for sure. He's not unconscious. He's not in a coma. He's intoxicated in my opinion but he's got certain effects, and his perceptual functioning at that point. * * * He's walking along and part of himself is like warning with [sic] another part, if you will. The effect on cognition and disassociation is that one part of your regular cognition is going on, you're thinking. Part of him is saying, "Guy, what are you doing?" and another part of himself is observing himself as though there is a separate part of himself doing some other thinking.

As a result of the depersonalization which Dr. Malmquist described as a mental illness, Dr. Malmquist concluded that appellant "knew the nature of the act but because of that depersonalized state related to the alcohol intoxication, that he would not have registered that act as wrong." Dr. Malmquist modified his opinion, however, by indicating:

It becomes impossible to deliniate what part of himself was seeing it as wrong and what part wasn't. Part of him was and part of him wasn't, and I think the jury is in a very difficult situation of trying to assess how that comes out, what percent was which. I think both were there.

In light of Dr. Malmquist's latter testimony, it is apparent that the jury could have reasonably concluded that defendant failed to prove his insanity defense by a fair preponderance of the evidence. Dr. Malmquist indicated that part of appellant knew his actions were wrong and part of him did not, and acknowledged the jury would have a difficult determination. The circumstances surrounding the shooting, such as (1) the appellant's argument with the victim; (2) driving to get the shotgun; (3) firing of four shots; (4) only hitting the victim; and (5) flight from the scene, all support the jury's determination that appellant was not legally insane when he killed Thomas Kohrt.

Appellant also contends that the jury found that appellant had not met his burden of proving insanity because the trial court erroneously read a portion of Dr. Malmquist's testimony in response to the jury's question: "Did the prosecutor ask if depersonalization was caused by intoxication in this case?" Appellant argues that by reading only portions of the testimony the trial court gave undue prominence to the evidence reviewed.

■ We find that the trial court did not abuse its discretion in allowing the jury to review a portion of Dr. Malmquist's testimony. Minn.R.Crim.P. 26.03, subd. 19(2), authorizes the trial court to have requested testimony read to the jury. The trial court in the present case had the court reporter read portions of testimony from appellant's direct examination of the witness, as well as portions of the cross-examination by the state. The trial court also carefully instructed the jury not to take the reviewed testimony out of context, nor "highlight the parts of the testimony that will be read back to you, but to consider the testimony as a whole."

The record supports the jury conclusion that appellant failed to prove mental illness by a fair preponderance of the evidence.

Affirmed.

WAHL, J., took no part in the consideration or decision of this case.