STATE of Minnesota, Respondent,

v.

Charles Ray BARNES, Appellant.

No. A05–810.

Supreme Court of Minnesota.

April 27, 2006.

Michael A. Hatch, Attorney General, State of Minnesota, Saint Paul, MN, James Backstrom, Dakota County Attorney, Hastings, MN, for Respondent.

Charles Ray Barnes, Saint Cloud, MN, Appellant Pro Se.

Marie Wolf, Office of the Minnesota State Public Defender, Minneapolis, MN, for Appellant.

## OPINION

HANSON, Justice.

Appellant Charles Ray Barnes appeals from his conviction of first-degree domestic abuse murder, Minn.Stat. § 609.185(a)(6) (2004). He argues that domestic abuse murder violates the Equal Protection Clause of the Minnesota Constitution because the elements of the crime overlap with those of third-degree depraved mind murder, Minn.Stat. § 609.195(a) (2004), but domestic abuse murder provides for significantly greater penalties. He also requests a new trial based on several claims of procedural error. We affirm.

Minutes before midnight on July 13, 2004, Barnes called 911 from his Burnsville apartment reporting that he had just arrived home and found his ex-wife, Erin Rooney, unconscious and not breathing. He told the dispatcher that he thought she had overdosed on drugs or alcohol. He said he dragged her from the living room to the bathroom to try to wake her up with water because he thought she had just passed out. Barnes performed some chest compressions at the dispatcher's direction.

Two police officers attempted CPR by administering chest compressions and tilting Rooney's head to open her airway. The paramedics arrived shortly thereafter and learned that Rooney had been in this state for 20 to 30 minutes before Barnes called 911. The officers stopped resuscitation efforts a few minutes later when paramedics pronounced her dead.

One officer observed a syringe with a small amount of liquid inside and a rolled-up dollar bill on a table in the living room. When the officer asked Barnes about it, he said it belonged to Rooney and that she was a heroin addict. Rooney had a puncture mark on her inner right arm that appeared to be from a needle. An officer then briefly interviewed Barnes and his version of what happened changed slightly from what he had told the dispatcher. He said he and Rooney ate dinner together and that he went to bed around 9:00. He said he woke up a few hours later and found Rooney unconscious. The officers acknowledged that there was no sign of a struggle in the apartment and that they initially treated the case as a death investigation, not a homicide. Although they took some photographs, they did not change the locks on the apartment or otherwise secure it, they allowed Barnes to leave with his relatives, and they collected no evidence.

An investigator at the coroner's office responded to the death scene. With the assistance of five or six police officers, she secured Rooney's body in a body bag and loaded it into the investigator's personal vehicle. The investigator drove to the morgue and unloaded Rooney's body onto a gurney by herself.

The next day the medical examiner, Dr. Lindsey Thomas, performed an autopsy on Rooney's body and documented numerous injuries: (1) several bruises and abrasions; (2) defensive injuries on her hands; (3) hemorrhaging in her neck; (4) a broken hyoid bone (in her neck); (5) petechiae (ruptured blood vessels) in her eyes; (6) swelling and congestion in her face; (7) injuries to her lips and tongue; and (8) a contusion under her chin. At trial Dr. Thomas conceded that until she discovered

the neck injuries, the numerous other injuries on Rooney's body were consistent with a drug overdose. It was not until Dr. Thomas found the broken hyoid bone and hemorrhage in Rooney's neck that the police began treating the investigation as a homicide.

Barnes was arrested that evening at his mother's house. The only injury officers found on Barnes was a scratch on his back. Police executed a search warrant on the apartment but found nothing else of significance. At trial, the state introduced medical evidence through the medical examiner who performed the autopsy, Dr. Thomas, and a forensic pathologist who reviewed Dr. Thomas' conclusions, Dr. Dean Hawley. The state's theory was that Barnes strangled Rooney during the course of a domestic assault, and then injected her with heroin to create the appearance of a drug overdose.[1] Dr. Hawley gave his opinion that each of Rooney's injuries occurred while she was still alive and that she died from asphyxiation due to manual strangulation.

Barnes' theory was that Rooney died from an overdose of heroin and alcohol. On cross-examination of the state's witnesses, he tried to show that all of Rooney's injuries could be explained by other causes. He argued that the drugs and alcohol she consumed caused her to fall down and bump into things, which caused all of her bruises and abrasions. He also suggested that the hyoid bone either broke when Rooney fell and hit some furniture, or when the coroner's investigator mishandled Rooney's body. Finally, he suggested that the neck hemorrhages were the result of an improper autopsy procedure.

Because of the importance of the medical testimony, defense counsel applied to the court for, and was granted, state funds to hire two different medical experts.[2] The court carved out an exception to its sequestration order allowing Barnes' expert to be present during the state's medical testimony to aid in cross-examination. Barnes did not take advantage of this authorization. Barnes listed only one of the two experts as a potential witness. After the state closed its case, Barnes reported that the listed expert witness was unable to appear. Barnes moved for a mistrial or for a continuance, suggesting that the time was needed to retain another expert. Barnes only gave a vague reason why the listed witness was unable to appear, and did not explain why the other expert he had retained was not listed as a witness, or who he would now seek to retain. The court denied his motion.

Barnes was found guilty of first-degree domestic abuse murder, Minn.Stat. § 609.185(a)(6); second-degree unintentional felony murder, Minn.Stat. § 609.19, subd. 2(1) (2004); and first-degree felony assault, Minn.Stat. § 609.221, subd. 1 (2004), but not guilty of second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2004). He was sentenced to life in prison based on the first-degree domestic abuse murder conviction. This appeal followed.

## I.

▇▇▇ Barnes first argues that his sentence for first-degree domestic abuse murder should be vacated and a new sentence

---

1. The state presented evidence that the puncture mark on Rooney's right arm did not reach her vein, Rooney hated needles, Rooney was right-handed, and that her lungs did not contain a certain crystal typically found in intravenous drug users. Dr. Hawley testified that Rooney's heroin level appeared to be one large dose injected shortly before her death.

2. The expert witness fund of the state public defender's office was previously depleted.

imposed for the second-degree murder conviction. He argues that the domestic abuse murder statute violates the Equal Protection Clause, article 1, section 2 of the Minnesota Constitution.[3] Unless a fundamental right or suspect class is involved, statutes are presumed to be constitutional. *Rio Vista Non–Profit Housing Corp. v. County of Ramsey*, 335 N.W.2d 242, 245 (Minn.1983). We will hold a statute unconstitutional "only when absolutely necessary." *State v. Behl*, 564 N.W.2d 560, 566 (Minn.1997). The constitutionality of a statute is a question we review de novo. *State v. Machholz*, 574 N.W.2d 415, 419 (Minn.1998).[4]

Barnes makes two equal protection arguments. First, he claims that first-degree domestic abuse murder impermissibly overlaps with third-degree depraved mind murder. Second, he argues that first-degree domestic abuse murder singles out domestic abusers for harsher punishment without a rational basis.

### A. Overlapping Statutes

■ Section 609.185(a)(6), the domestic abuse murder statute, makes it first-degree murder to cause "the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim * * * and the death occurs under circumstances manifesting an extreme indifference to human life." Section 609.195(a), the depraved mind murder statute, makes it third-degree murder to, without intent to effect the death of any person, cause "the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard to human life." The penalty for first-degree domestic abuse murder is life imprisonment and the penalty for third-degree depraved mind murder is a maximum of 25 years in prison, with a presumptive sentence under the sentencing guidelines of 150 months in this case. Barnes argues that "there is no significant difference in the culpable mental state required by these statutes" and that "the lack of a meaningful variance between the two does not justify the huge disparity in the two sentences under the equal protection provisions of the Minnesota Constitution."

Barnes relies in part on the equal protection analysis of Professor Wayne R. LaFave, who classifies three types of overlapping statutes and discusses the differing equal protection implications of each:

(1) where one statute defines a lesser included offense of the other and they carry different penalties (e.g., whoever carries a concealed weapon is guilty of a misdemeanor; a convicted felon who carries a concealed weapon is guilty of a felony); (2) where the statutes overlap and carry different penalties (e.g., possession of a gun by a convicted felon, illegal alien or dishonorably discharged serviceman is a misdemeanor; possession of a gun by a convicted felon, fugitive from justice, or unlawful user of narcotics is a felony); (3) where the statutes are identical (e.g., possession of a gun by a convicted felon is a misdemeanor; possession of a gun by a convicted felon is a felony).

---

**3.** That section provides that "[n]o member of this state shall be disfranchised or deprived of any rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."

**4.** Because Barnes did not challenge the constitutionality of the statute at trial, we need not consider the issue here. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989). But we choose to address Barnes' constitutional claims in the interests of justice. *See State v. Benniefield*, 678 N.W.2d 42, 45 (Minn.2004).

4 Wayne R. LaFave, et al., *Criminal Procedure* § 13.7 at 95–96 (2d ed. 1999). LaFave identifies the first category as "certainly unobjectionable," the second as "presenting a harder case," and the third as "highly objectionable." *Id.* at 96. Barnes argues that domestic abuse murder falls under this second category because it overlaps with the depraved mind murder statute.

Barnes concedes that the situation here would not violate the Equal Protection Clause of the United States Constitution because of the Supreme Court's decision in *United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). But he argues that we should not follow *Batchelder* in interpreting the Minnesota Constitution because (1) we have applied a more rigid equal protection standard under the Minnesota Constitution,[5] and (2) the overlapping statutes in *Batchelder* involved minimally different sentences, whereas the murder statutes here involve significantly different sentences. We disagree with the threshold of Barnes' argument because we do not view these two statutes as being sufficiently overlapping to present equal protection concerns. They punish very different conduct.

First, domestic abuse murder focuses on a specific type of actus reus—death while committing domestic abuse—while depraved mind murder is much more broad—death while "perpetrating an act eminently dangerous to others." Barnes argues that these requirements are identical because "it is likely that nearly all domestic abuse incidents resulting in death could be classified as '[eminently] dangerous.'" Even if this were true, the conclusion that the requirements are identical does not follow because the reverse is not true. Not all "eminently dangerous" acts constitute "domestic abuse."

Second, domestic abuse murder is more specific because it only applies to (1) a specific group of defendants who cause the death of (2) a specific group of victims. Domestic abuse murder only applies to defendants who have "engaged in a past pattern of domestic abuse upon the victim." Minn.Stat. § 609.185(a)(6). Depraved mind murder applies to any defendant. Minn.Stat. § 609.195(a). Domestic abuse murder only applies with a victim who had a domestic relationship with the defendant. Minn.Stat. § 609.185(c)(2); *see* Minn.Stat. § 518B.01, subd. 2(b) (2004). Depraved mind murder, on the other hand, can apply with "any person" as the victim. Minn.Stat. § 609.195(a).

The statutes can also be distinguished because the mens rea elements have a different focus. Domestic abuse murder requires that the extreme indifference be directed at the specific person. Depraved mind murder, on the other hand, cannot occur where the defendant's actions were focused on a specific person:

> This statute was intended to cover cases where the reckless or wanton acts of the accused were committed *without special regard to their effect on any particular person or persons;* the act must be committed without a special design upon the particular person or persons with whose murder the accused is charged.

*State v. Wahlberg*, 296 N.W.2d 408, 417 (Minn.1980) (citations omitted) (emphasis added) (holding that an instruction on depraved mind murder was inappropriate where the evidence suggested "that all the blows were directed toward the victim").

---

**5.** *See State v. Russell*, 477 N.W.2d 886, 889 (Minn.1991) (holding there is no rational basis under the Minnesota Constitution to justify the significant disparity in punishment between users of crack cocaine versus users of powder cocaine).

There is a further basis to distinguish the mens rea elements of the two statutes. We have interpreted the "depraved mind" standard from depraved mind murder to be equivalent to a reckless standard. *See State v. Carlson,* 328 N.W.2d 690, 694 (Minn.1982). Domestic abuse murder requires proof of at least one of the underlying domestic abuse crimes, each of which has an intent element. *See* Minn.Stat. § 609.185(c) (requiring that the state also prove one of the enumerated underlying "domestic abuse" crimes).

Because the two statutes do not punish identical conduct, their coexistence does not present an equal protection concern.

### B. Disparate Treatment

■ Barnes suggests that domestic abuse murder violates equal protection because, without a rational basis, it singles out domestic abusers for harsher punishment than those who commit depraved mind murder. He focuses on the "past pattern of domestic abuse" element of domestic abuse murder.

■ When a statute does not involve a suspect classification or a fundamental right, this court reviews the constitutional challenge to the statute under a rational-basis test. *Scott v. Minneapolis Police Relief Ass'n,* 615 N.W.2d 66, 74 (Minn. 2000). Barnes does not claim that domestic abuse murder involves a suspect classification or a fundamental right. Thus domestic abuse murder is presumed to be constitutional "if the classification drawn by [the statute] is rationally related to a legitimate governmental interest." *Kolton v. County of Anoka,* 645 N.W.2d 403, 411 (Minn.2002). This court employs a three-pronged rational-basis test:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991) (citations omitted).

■ Barnes does not take a position on the second or third prongs. The obvious purpose of the domestic abuse murder statute is to combat domestic violence. This is certainly a legitimate legislative goal. And providing harsher punishment for those who have a past pattern of domestic abuse serves that goal. Barnes focuses only on the first prong, arguing that the "past pattern of domestic abuse" element creates an arbitrary classification because it is both overinclusive and underinclusive.

As for overinclusiveness, Barnes argues that because domestic abuse murder only requires prior allegations of domestic abuse, and not prior convictions, some defendants may be wrongfully convicted of domestic abuse murder based on unproven allegations. But we have repeatedly upheld this portion of the statute against similar arguments made in the context of due process challenges. *State v. Manley,* 664 N.W.2d 275, 283 (Minn.2003); *State v. Crowsbreast,* 629 N.W.2d 433, 438 (Minn. 2001); *State v. Cross,* 577 N.W.2d 721, 727 (Minn.1998); *State v. Kelbel,* 648 N.W.2d 690, 703 (Minn.2002) (upholding an identical element from the first-degree child abuse murder statute).

As to underinclusiveness, Barnes argues that because "domestic abuse is an underreported crime," some defendants who actually have a past pattern of domestic abuse are not charged with first-degree domestic abuse murder because the past incidents were unreported. But the authority he cites refers to domestic assault being unreported to law enforcement. The past pattern requirement can be proven by incidents that were not reported to law enforcement. *See Manley,* 664 N.W.2d at 280. Further, substantial deference is given to the legislature where an underinclusiveness challenge is made on rational basis review. *See Haskell's Inc. v. Sopsic,* 306 N.W.2d 555, 559 (Minn.1981).

We hold that the domestic abuse murder statute does not violate the Equal Protection Clause of the Minnesota Constitution.

## II.

Barnes next argues that he should be granted a new trial because the district court abused its discretion in denying his motion for a mistrial or a continuance when his expert witness became unavailable to testify. "The decision to grant or deny a continuance lies within the discretion of the trial judge." *State v. Lloyd,* 345 N.W.2d 240, 247 (Minn.1984). A defendant must show that the denial "prejudiced defendant by materially affecting the outcome of the trial." *State v. Turnipseed,* 297 N.W.2d 308, 311 (Minn.1980).

Following the presentation of the state's case, Barnes requested a continuance or a new trial arguing that he needed time (1) to secure an expert witness to refute a portion of Dr. Hawley's testimony that was erroneous and (2) to respond to statements Dr. Hawley made that he says were not in Dr. Hawley's pretrial disclosure. Although this latter ground for the motion was characterized before the district court as a "discovery violation," Barnes did not make a record of Dr. Hawley's pretrial disclosure or demonstrate how his trial testimony differed from it. Thus Barnes did not support any claim for a discovery sanction. Further, when making the motion for the continuance Barnes' counsel said, "I have no intention of asking an expert to testify about cause of death or review the file." Accordingly, the only remaining ground for the motion for continuance was Barnes' assertion that he needed one week to secure additional medical testimony to respond to two disputed portions of Dr. Hawley's testimony. Our independent review of the record reveals that the district court did not abuse its discretion in denying Barnes' motion.

The district court took steps to ensure that Barnes had adequate access to expert medical advice during trial. The court granted both of Barnes' requests for public funds to hire expert witnesses. The court authorized sufficient funds to enable Barnes to have one of the experts present to assist his counsel during testimony of the state's medical witnesses. The court also made an exception to the sequestration order so that Barnes' medical expert could be present while the state's medical witnesses testified. Barnes did not take advantage of this authorization. He did not have an expert present during Dr. Hawley's testimony and he did not have an expert available to testify in response to Dr. Hawley.

Further, Barnes made his motion for a continuance after the close of the state's case two weeks into a murder trial that involved numerous witnesses and complex medical testimony. Greater deference is generally given to the district court's denial of a continuance where, as here, the trial had already begun. *See, e.g., State v. Beveridge,* 277 N.W.2d 198, 199 (Minn.1979) ("One who waits until the day of trial before moving for a continu-

ance ought to have a good explanation for the delay."). When the court asked why Barnes' expert was not available, Barnes' counsel did not have a good explanation, stating only, "apparently she has scheduling difficulties, and frankly I think she also has some job concerns." This was insufficient to constitute good cause.

Finally, our review of the record reveals that Barnes misunderstood or exaggerated both the content and the importance of the two portions of Dr. Hawley's testimony that he criticizes.

First, Barnes argues that Dr. Hawley surprised him when he testified that a bone in Rooney's neck—the hyoid bone— "was completely broken off and that it had blocked the airway." Barnes does not argue that he was unaware that the hyoid bone was fractured. Instead he seems to be arguing that his surprise was limited to Dr. Hawley's testimony that the fracture was a complete break, as opposed to it being a crack that left the bone intact. But the question of whether the fracture was complete or a crack was not crucial to the state's case or to Dr. Hawley's conclusions. Dr. Hawley testified that the cause of death was asphyxiation from the impaired flow of blood from Rooney's heart to her brain, not suffocation from the impaired flow of oxygen from her mouth/nose to her lungs. He testified that a broken hyoid bone is not necessary to cause asphyxiation and, in fact, is uncommon in strangulation cases. In other words, the broken hyoid bone was irrelevant to the cause of Rooney's death. Dr. Hawley said the only relevance of the broken hyoid bone was to show the extreme amount of force applied to her neck.

As to Barnes' suggestion that Dr. Hawley testified that the hyoid bone blocked the airway, we find nothing from his testimony to suggest that the complete fracture of the hyoid bone could do more to block Rooney's airway than a fracture that was only a crack. Dr. Hawley testified that in order to fracture the hyoid bone, sufficient pressure would have to be applied to the neck so as to collapse the larynx and thus close off the airway. In other words, Rooney's airway could have been closed off whether the fracture to Rooney's hyoid bone was complete or merely a crack. Moreover, Dr. Hawley did not testify that the hyoid bone obstructed Rooney's airway. Instead he said the pressure to her neck caused the airway to collapse and become obstructed.

Second, Barnes says Dr. Hawley testified that a phenomenon known as the Prinsloo Gordon artifact [6] is limited to decomposed bodies. Barnes argues this is medically incorrect and that he needed an expert to refute it.

Barnes first raised the issue of the Prinsloo Gordon artifact during cross-examination of the state's medical examiner, Dr. Thomas. Barnes' counsel questioned Dr. Thomas based on an excerpt from a treatise, Pekka Saukko & Bernard Knight, *Knight's Forensic Pathology* 375 (3d ed. 2004), which refers to the artifact. Then, on direct examination of Dr. Hawley, the state also referred to the same portion of this treatise. Dr. Hawley explained:

The original description is a 1951 medical paper out of the Medical Journal of South Africa. * * * And they describe a technique for dissection of the neck so that you can avoid having blood

---

**6.** The Prinsloo Gordon artifact is a disruption of the body during the autopsy that creates the appearance of pre-mortem neck hemorrhaging. It is caused by an improper dissection technique, not pre-death violence. At trial Barnes argued that the hemorrhage observed in Rooney's neck was an "artifact" from the autopsy, not an "injury" from strangulation.

drained from the blood vessels of the neck into the field of your dissection while you're performing the autopsy.

What they were working with and what many other medical reporters have described in much more modern times is that it is extremely difficult, as I said previously, to determine strangulation in decomposed bodies. And what we end up with very often is a decomposed body for whom you're trying to figure out the cause of death. And these hemorrhages can develop in the neck during the natural part of this process of putrefaction.

\* \* \*

\* \* \* \*

But what we're dealing with for the most part is the problem that decomposition causes.

The state then showed Dr. Hawley a picture from the treatise and Dr. Hawley identified the picture as "obviously" being from a decomposed body. He then contrasted the picture with Rooney's autopsy: "[S]he's not decomposing. There's no decomposition and none of that artifact was present in this body."

Dr. Hawley never expressly testified that the Prinsloo Gordon artifact was limited to decomposed bodies. To the extent that Dr. Hawley's testimony could be construed to imply this, defense counsel had the opportunity to clarify this point on cross-examination but did not.

■ Barnes also argues that a continuance or new trial was warranted by the state's failure to disclose e-mail communications between the prosecutor and Dr. Hawley that Barnes discovered during cross-examination. But this issue was not preserved for appeal. Barnes' counsel specifically said she was not requesting a continuance on this issue. Counsel requested 30 minutes to review the e-mails and the court granted that request. Barnes did not, and still does not, disagree

with the court's determination that the e-mails did not contain any information that was new or that Dr. Hawley used as a basis for his conclusions. Our independent review of the e-mails leads us to the same conclusion.

For these reasons the district court did not abuse its discretion in denying Barnes' motion for a continuance or a new trial.

### III.

Barnes makes several other allegations of error in his supplemental pro se brief.

*Ineffective Assistance of Counsel*

Barnes argues that his attorneys deprived him of his Sixth Amendment right to effective assistance of counsel because (1) they were surprised by Dr. Hawley's testimony that the hyoid bone was completely broken, and (2) they were not prepared to cross-examine or rebut the state's medical witnesses.

To the extent that Barnes' ineffective assistance of counsel claim relates to the failure to present any defense medical expert testimony, it cannot be determined on the trial record. We are not able to determine whether this omission was a tactical decision, the result of a decision concurred in by Barnes, the failure to locate any witness who could help his case, or some other reason. Because additional facts are needed to review this issue, it is more properly suited for a postconviction proceeding. *Black v. State*, 560 N.W.2d 83, 85 n. 1 (Minn.1997). Therefore, we reject this aspect of Barnes' ineffective assistance of counsel claim without prejudice to the right of Barnes to attempt to develop and present such claim in a postconviction petition.

■ But to the extent Barnes criticizes defense counsels' conduct of the trial, his claim can be determined on this record.

*Torres v. State,* 688 N.W.2d 569, 572 (Minn.2004). A new trial based on a claim of ineffective assistance of trial will only be granted if the defendant proves:

> First * * * that counsels' performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsels' errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Fox v. State,* 474 N.W.2d 821, 826 (Minn. 1991) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "[T]here is a strong presumption that a counsels' performance falls within the wide range of reasonable professional assistance." *Hodgson v. State,* 540 N.W.2d 515, 518 (Minn.1995) (quoting *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986)).

On the record of the trial, counsels' performance does not rise to the level of ineffective assistance of counsel under *Strickland.* As already established, the difference between a crack in the bone and a complete fracture was immaterial to the cause of death and thus did not prejudice Barnes' defense. As for the claim that counsel was not prepared for the state's medical witnesses, the cross-examination of each witness was vigorous and detailed. Counsel secured several concessions favorable to Barnes, made numerous objections, and made numerous motions.

### Sufficiency of the Evidence

■ Barnes argues that there was insufficient evidence to support his conviction for first-degree assault because each of the injuries could have been explained by other causes. Barnes is essentially asking us to view the evidence in the light most favorable to him. But the evidence must be taken in the light most favorable to the verdict. *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989). And the state's expert witnesses ruled out each of these other causes of injury with "scientific certainty," giving their opinions that the cause of death was strangulation. The evidence was sufficient.

### Prosecutorial Misconduct

■ Barnes argues that the prosecutor violated his rights during closing argument by giving an "unqualified medical reason" as to why Barnes vomited, and by giving a "purely hypothetical" and unwitnessed "blow by blow" account of a fight that the state claimed had occurred between Barnes and Rooney. The state's closing argument can include reasonable inferences from the evidence. *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995). The prosecutor's comment about Barnes vomiting was qualified and was a reasonable inference from the evidence: "I suggest that the evidence, the totality of the evidence shows that he started getting sick because he was afraid." Further, each of the prosecutor's remarks about the fight and how Rooney sustained various injuries was supported by medical testimony.

### Improper Character Evidence

■ Barnes argues that the district court erred by not declaring a mistrial when one of the officers commented on a conversation he had with Barnes about Barnes' past drug use. Apparently, the state agreed that it would not disclose this information. The disputed testimony arose when the state asked the officer to review his report to refresh his memory about the conversation. The officer began reading his report and said: "He talked about her drug use, heroin use. He made

comments that he used it at one time but was not currently using."

This disclosure appears to have been inadvertent and the district court immediately gave the jury a curative instruction. More importantly, events that occurred later in trial eliminated any prejudice in the statement about Barnes' past drug use. While in prison Barnes made a telephone call to a friend in which he stated that he was under the influence of heroin when Rooney died. The court determined that this statement was admissible because it showed that he had knowledge of heroin and the methods for ingesting it, which was relevant to the state's claim that Barnes injected heroin into Rooney's body after her death. Barnes did not object to or appeal from this decision. Thus the officer's statement was harmless.

*Failure to Test Evidence*

 Barnes argues that the police violated his rights because they did not test vomit in the toilet. Barnes does not argue that the vomit could have been from an alternate perpetrator. Instead he says this is important because the vomit could have been from Rooney and one of the experts conceded that vomiting can cause petechiae, a condition found in the autopsy. But even if the vomit was from Rooney, (1) the state's experts ruled out vomiting as the cause of Rooney's petechiae, and (2) none of her other injuries could have been explained by the vomit. Thus, the failure of the state to test the vomit did not violate Barnes' rights.

*Improper Jury Influence*

Finally, Barnes argues that the court erred by not declaring a mistrial during jury selection when a potential juror brought to the court's attention an incident where other potential jurors were discussing Barnes' guilt or innocence. He argues that the court excused a certain

pool of jurors instead of all of them. But Barnes failed to order a transcript of the jury selection and the state did not stipulate to the facts claimed by Barnes. Because Barnes' arguments are not supported in the record, the issue is deemed waived. *See State v. Engler*, 319 N.W.2d 705, 705 (Minn.1982).

Affirmed.