STATE of Minnesota, Respondent,

v.

**Roger Lindbo SCHLEICHER,**
**Appellant.**

No. C3–02–2043.

Supreme Court of Minnesota.

Dec. 24, 2003.

Mary M. McMahon, McMahon & Associates Criminal Defense, Ltd., Roseville, MN, for Appellant.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Douglas L. Ruth, Steele County Attorney, Owatonna, MN, for Respondent.

## OPINION

PAGE, Justice.

Roger Lindbo Schleicher (Schleicher) was indicted on one count of first-degree murder under Minn.Stat. § 609.185(a)(1) (2002) as a result of the shooting death of his close friend, Jack Johannsen (Johannsen). At trial, Schleicher pled not guilty and not guilty by reason of mental illness under Minn.Stat. § 611.026 (2002),[1] often referred to as the "M'Naghten rule,"[2] Minnesota's legal insanity statute.[3]

---

1. Section 611.026 reads:
   No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong.

2. *See* Daniel M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718 (1843).

3. A defendant who pleads not guilty by reason of mental illness or mental deficiency is afforded a bifurcated trial under Minn. R.Crim. P. 20.02, subd. 6(2). The first phase of the trial requires determining whether the state has met its burden of proof as to the defendant's guilt. *See* Minn. R.Crim. P. 20.02, subd. 6(4)(a). If the defendant is found guilty, the second phase takes place to determine whether the defendant has sustained the burden of establishing the defense of mental illness. *Id.*

Schleicher waived his right to a jury trial and, at the conclusion of the guilt phase of the trial, the trial court returned a guilty verdict. After the mental illness phase, the trial court rejected Schleicher's defense and reaffirmed the guilty verdict. Schleicher was sentenced to life in prison.[4] On appeal, Schleicher contends that his conviction should be reversed because the unconstitutionally vague language of Minn. Stat. § 611.026 violated his due process rights. We affirm.

The following facts were established at trial. Schleicher has a history of mental illness that is extensive and well-documented. Schleicher began exhibiting psychotic symptoms in 1989 and was hospitalized in Owatonna. His symptoms included, among other things, his belief that: (1) his employment law attorney was involved with the mafia and that the mafia was involved with his employer; (2) his son was born one month premature because his wife was in collusion with her doctors so that Schleicher would have a spiritual revelation; and (3) his wife and mother-in-law gave his father-in-law cancer.

Schleicher was civilly committed as mentally ill in March of 1992 after threatening to kill his wife. When he was discharged from the commitment in June of 1992, his diagnoses included: schizophrenia, paranoid type; organic delusional disorder; and major affective disorder. Schleicher was again civilly committed as mentally ill in February 1993. This time, among other things, Schleicher believed that his phone was bugged and that people were trying to poison him. He was discharged from this commitment in August 1993. In August 1996, Schleicher admitted himself to the hospital. When he was discharged in De-

cember 1996, his diagnoses included adjustment disorder with depression, paranoid schizophrenia, and alcohol abuse. In August 1998, Schleicher was civilly committed as mentally ill and chemically dependent. At that time, Schleicher stated that "someone might be killed" if he was not admitted, and a shotgun and ammunition were found in the trunk of his car. He was discharged from this commitment in March 1999. Finally, Schleicher was civilly committed as mentally ill and dangerous in February 2000. Schleicher was discharged from this commitment on June 16, 2000.

In the fall of 2000, Schleicher was again having delusional thoughts. These delusions included thinking that: (1) he was God, as was confirmed by the fact that his son was born on Christmas Day; (2) the Chinese were the enemy, were against God, and were going to cause the end of the world; and (3) a nuclear war was going to happen on New Year's Eve and that he was "ground zero" for this war because of the iron cross tattoo on his body.

After attending church services on December 24, 2000, Schleicher, concerned about his mental health, drove 70 miles to the Blue Earth hospital in search of psychiatric care. According to Schleicher, he chose the Blue Earth hospital because it was parallel to railroad tracks. Because the hospital did not have a psychiatric unit, Schleicher was transported to the Austin Medical Center, where he was initially interviewed by a social worker. The social worker, concerned that Schleicher might be a security risk, had a hospital security officer present during the interview. The social worker observed that "[Schleicher] is perceived to be more experiencing persecutory type of thoughts while with the

---

4. On February 15, 2001, Schleicher was civilly committed to the Minnesota Security Hospital, located at the St. Peter Regional Treatment Center, as mentally ill and dangerous. He apparently remains so committed at that location to this day.

undersigned, however, there is also some indication from other observers that would identify some real bizarre type of thinking occurring on this day." The social worker also noted that Schleicher was seeking a letter from a doctor that would permit him to purchase a gun, and that Schleicher admitted that there were people at imminent risk of harm from him. While the social worker consulted with other doctors, Schleicher had a conversation with the security officer wherein he discussed the moon phases, the effect the moon phases had on his behavior, and the fact that Japan and China were taking over the world. Schleicher also told one of the doctors at the center that, "Two policemen are screwing me royal and I need a f——ing gun—they have guns, why can't I?" Schleicher was released from the Austin Medical Center on December 27, 2000.

On the morning of December 29, 2000, Johannsen told his wife that Schleicher had called and that he was going to Schleicher's house to help him get groceries and find a car. Johannsen left his house at 10:20 a.m. At 10:30 a.m., Schleicher left a message on Johannsen's cellular telephone saying, "Jack, this is Roger, hurry it up. That case guy called from the County, I've got to get out of here." Shortly after 11:00 a.m., Schleicher called the Steele County Sheriff's Department and reported a hunting accident on his elk farm. Schleicher told the dispatcher that Johannsen was dead. At 12:10 p.m., Schleicher called again and indicated to the dispatcher that Johannsen was still alive. Schleicher called a third time at 12:25 p.m. By then, law enforcement officers were approaching Schleicher's house using a road grader as cover. As the officers approached, Schleicher came out of the house with his hands up, laid down on his back, made a snow angel by flailing his arms and legs, and then turned over on his stomach when ordered to do so by the

law enforcement officers. Johannsen's body was found in the house and shotgun shells and two guns were found in Schleicher's garage.

Schleicher was transported to the Steele County Jail. While being transported, Schleicher, referring to Johannsen, commented that, "I can't believe a Vietnam veteran fell for that trap." At the jail, Schleicher was interviewed by a BCA agent that afternoon. During the interview, Schleicher indicated that he had been having problems with Johannsen. He indicated that he thought Johannsen was stealing from him and referred to Johannsen as "Wells Fargo" and himself as "Norwest." In addition to the Wells Fargo and Norwest references, Schleicher indicated that his case worker and members of the media hinted to him that he should kill Johannsen. Schleicher also claimed that Johannsen was a drug dealer and had given drugs to his children and Johannsen's niece, and that Johannsen had bugged his telephone and made a fool out of him. During the interview he indicated that he had lured Johannsen to the house to kill him. According to Schleicher, when Johannsen entered the house, he [Schleicher] was holding a 12–gauge shotgun and smiled at Johannsen and shot him six times. Before firing the last shot, Schleicher said to Johannsen, "Jack, if you can't stand the heat stay out of the kitchen."

The autopsy on Johannsen's body confirmed that Johannsen had suffered six separate gunshot wounds from a shotgun, one of which was to his head. The medical examiner who performed the autopsy concluded that the wound to the head occurred while the gun was at close range, while the other wounds were a result of shots fired at a range of 12 to 15 feet. The cause of death was excessive blood loss and extensive destruction of the brain.

On January 11, 2001, Schleicher was admitted to the Minnesota Security Hospital to undergo a Rule 20.01 competency examination.[5] Dr. Karen Bruggemeyer conducted the examination. She diagnosed Schleicher as suffering from paranoid schizophrenia and narcissistic personality disorder. She concluded that Schleicher was not competent to stand trial and that he met the criteria for civil commitment as mentally ill and dangerous.

Pursuant to a court order dated April 13, 2001, Dr. Bruggemeyer also conducted a Rule 20.02 mental examination.[6] During this examination, Schleicher discussed his delusions and then gave an account of the events leading up to the murder that differed sharply from the account given to the BCA agent on the afternoon of his arrest. According to Dr. Bruggemeyer, Schleicher indicated that he was angry with Johannsen on the morning of the 29th because Johannsen initially refused to come to Schleicher's house. When Johannsen called back to say he was coming, Schleicher told him to stay off his property and Johannsen then threatened to physically assault him. As Johannsen pulled up to Schleicher's driveway, Schleicher retrieved his gun and loaded it for protection. When Johannsen walked into the house and kicked the kitchen table, Schleicher proceeded to shoot him. When Dr. Bruggemeyer inquired as to what he was feeling when he did this, Schleicher stated, "I was mad. He kicked the table so hard he put a dent in the refrigerator, I was afraid and angry."

On May 2, 2001, Schleicher underwent a second Rule 20.01 competency examination. Although the examiners agreed with Dr. Bruggemeyer's diagnoses, they determined that Schleicher was clinically stable at the time and was competent to stand trial for Johannsen's murder.

In June of 2002, Dr. Charles McCafferty examined Schleicher for the defense. The examination began with Schleicher stating that he lied to Dr. Bruggemeyer during

**5.** Minn. R. Crim P. 20.01, subd. 2, provides in relevant part:

> If during the pending proceedings, the prosecuting attorney, defense counsel or the court has reason to doubt the competency of the defendant, then the prosecuting attorney or defense counsel by motion or the court on its initiative shall raise the issue. * * * If the court in which a criminal case is pending determines upon motion of the prosecuting attorney or defense counsel or upon initiative of the court that there is reason to doubt the defendant's competency as defined by this rule, the court shall suspend the criminal proceedings and shall proceed as follows:
> * * * *
> (3) *Medical Examination.* The court shall appoint at least one examiner as defined in the Minnesota Commitment Act of 1982, Minn.Stat. Ch. 253B, or successor statute to examine the defendant and to report to the court on the defendant's mental condition.
> If the defendant is otherwise entitled to release, confinement for the examination may not be ordered if the examination can be done adequately on an outpatient basis. * * * If the examination cannot be adequately done on an outpatient basis or if the defendant is not otherwise entitled to be released, the court may order the defendant confined in a state mental hospital or other suitable hospital or facility for the purpose of such examination for a specified period not to exceed 60 days * * *.

**6.** Minn. R.Crim. P. 20.02, subd. 1, reads:

> The court having trial jurisdiction over the offense charged may order a mental examination of the defendant when the defense has notified the prosecuting attorney pursuant to Rule 9.02, subd. 1(3)(a) of an intention to assert a defense of mental illness or deficiency, when the defendant in a misdemeanor case pleads not guilty by reason of mental illness or mental deficiency, or when at the trial of the case, the defendant offers evidence of such mental condition.

the second examination. Schleicher then described the many delusions that distorted his thinking and shared one important delusion in particular. According to Dr. McCafferty, Schleicher felt that Johannsen was influenced by the Chinese and heard a voice tell him to shock Johannsen by killing him. Dr. McCafferty diagnosed Schleicher as suffering from paranoid schizophrenia, presently in remission.

Schleicher did not testify or present any evidence at the guilt phase of his trial and the trial court found Schleicher guilty of first-degree murder. During the mental illness phase of the trial, Dr. McCafferty and Dr. Bruggemeyer testified as to Schleicher's mental state at the time of the murder. Both doctors testified that Schleicher suffered from paranoid schizophrenia and that he was actively psychotic at the time he shot Johannsen. In addition, Dr. Bruggemeyer testified that Schleicher suffered from a personality disorder. Both doctors also testified that Schleicher knew the nature of his acts at the time of the shooting. The two doctors' opinions diverged with respect to whether Schleicher knew that the act of killing Johannsen was wrong. Dr. McCafferty testified that Schleicher satisfied the statutory test for legal insanity because the shooting was a product of Schleicher's mental illness, which caused Schleicher not to know that the act of shooting and killing Johannsen was wrong. Dr. Bruggemeyer testified that, although Schleicher was delusional at the time of the shooting, his actions resulted from his personality disorder as opposed to his paranoid schizophrenia. When asked why, in her opinion, Schleicher murdered Johannsen, Dr. Bruggemeyer referred to her report in which she wrote, "Jack Johannsen is dead because he kicked a table and threatened to kick Roger Schleicher's ass." Thus, it was Dr. Bruggemeyer's opinion that Schleicher did not meet the statutory test for legal insanity.

At the close of the mental illness phase of the trial, the trial court rejected Dr. Bruggemeyer's opinion that the murder was not a product of Schleicher's mental illness. In doing so, the trial court found that:

> The evidence appears overwhelming that the murder of Mr. Johannsen was a direct result of the active delusions[7] that were a major part of Defendant's mental illness. He would not have killed Mr. Johannsen if he had not been suffering from an active psychotic mental illness. In summary, Defendant's delusions caused him to increasingly fear and dislike Mr. Johannsen and the delusions led him to kill Mr. Johannsen in a brutal murder.

That finding notwithstanding, the trial court went on to find that Schleicher had not met his burden of persuasion to "show that the mental illness caused him either to be unaware of the nature of his act or to not know it was wrong." As a result, the court found that Schleicher was not excused from criminal liability under Minn. Stat. § 611.026 and therefore was guilty of first-degree murder. In support of its finding that Schleicher knew his actions were wrong, the trial court relied on background evidence indicating Schleicher's awareness of his legal obligations and his level of rationality, including Schleicher's decision to insure his son's car on December 24 or 25 and a conversation Schleicher had with the chief of police on the morning

---

7. A "delusion" has been defined as a "wrong belief, contrary to facts, which cannot be rectified by reasoning, persuasion, or evidence acceptable to the patient, or even by the patient's own observations." 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder D–26* (1981).

of the murder regarding another matter.[8] The trial court also relied on what it considered "traditional" reasons for murder offered by Schleicher in his interview with the BCA agent. Among these reasons were Schleicher's claims that: (1) Johannsen was stealing from him; (2) Johannsen was a drug dealer; (3) Johannsen had bugged his house; and (4) Johannsen may have been armed, which suggests the killing may have been an act of self-defense.[9] According to the trial court, "the primary sense is that Defendant was casting about for an excuse or an explanation that would tell both [the BCA agent] and the Defendant himself why he had done the terrible deed of killing his best friend." Finally, the trial court noted that Schleicher told Dr. Bruggemeyer he was afraid of Johannsen because Johannsen threatened to physically assault him and then informed Dr. McCafferty that this statement was a lie he told her to make it appear as though the killing was an act of self-defense. As the trial court stated, "Again, it appears that this story is more consistent with an attempt by the Defendant to excuse or explain acts that he knew were wrong rather than a reference to an act which he did not understand was morally wrong."

In this appeal, Schleicher does not challenge the sufficiency of the evidence presented in either the guilt or mental illness phase of the trial. Schleicher's lone contention is that the language of Minn.Stat.

§ 611.026 is unconstitutionality vague because the meaning of the word "know" in the statute is unclear and because the statute allows the admission of irrelevant evidence. Schleicher raises this issue for the first time on appeal. The state responds, arguing that because the issue was not raised in the trial court it is not properly before this court for review.

When the constitutionality of a statute is not challenged below, a party cannot raise the issue for the first time on appeal to this court. *Hampton v. Hampton,* 303 Minn. 500, 501, 229 N.W.2d 139, 140 (1975); *State v. Engholm,* 290 N.W.2d 780, 784 (Minn.1980). Here, defense counsel did not directly or implicitly argue that the word "know," as used in section 611.026, was unconstitutionally vague at the trial court level. In fact, defense counsel stated an intention to fit this case within section 611.026. Because the issue was not raised below, this court is procedurally barred from considering the issue. In that the constitutionality of section 611.026 is the only issue presented for our review, we affirm Schleicher's conviction.[10]

Affirmed.

---

**8.** In mid-December of 2000, Schleicher went to his ex-wife's house to see his children. While there, Schleicher got into an argument with his daughter and the police were called to the scene. Schleicher drove away while being chased by the police and was eventually arrested. Schleicher's car was impounded. The impounding of his car led to this conversation with Chief Staloch and led Schleicher to insure his son's car, which was being stored at his residence, so he could use it.

**9.** While Schleicher made these claims to the BCA agent there is nothing in the trial court record suggesting that there was a factual basis for any of these claims and, in fact, Johanssen's wife testified that Johanssen never stole from Schleicher or sold drugs.

**10.** In making his constitutional argument, Schleicher argues that the M'Naghten rule and, thus, section 611.026, are outdated and difficult to apply. In doing so, he draws our attention to a number of statements made by this court calling the M'Naghten rule into

question. *See, e.g., State v. Dhaemers,* 276 Minn. 332, 339, 150 N.W.2d 61, 66 (1967) ("While we agree that the M'Naghten rule should have been discarded with the horse and buggy \* \* \*."); *State v. Eubanks,* 277 Minn. 257, 263–64, 152 N.W.2d 453, 457 (1967) ("While we do not imply that the defense did not present a convincing case for the fact that the M'Naghten rule is an ancient and archaic tool for criminal responsibility \* \* \*."). This case highlights the concern expressed in these cases. Those concerns generated a fair amount of discussion at oral

argument. Of particular concern, on the facts presented by this case, is, the interplay between Schleicher's mental illness as manifested by his delusions and his ability to know that his actions were wrong. That question appears not to have been raised at trial and, although raised generally in Schleicher's pro se brief to this court, is not accompanied by any argument.

While in some cases we might address the issue in the interests of justice, we decline to do so here because the record below has not been adequately developed by the parties.