**STATE of Minnesota, Respondent,**

v.

**John Jason McLAUGHLIN, Appellant.**

**No. A05–2327.**

Supreme Court of Minnesota.

Jan. 11, 2007.

John M. Stuart, State Public Defender, Davi E. Axelson, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Minnesota Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Janelle Kendall, Stearns County Attorney, St. Cloud, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Fifteen-year-old John Jason McLaughlin was tried as an adult and convicted for the murders of two fellow students whom McLaughlin shot at Rocori High School in Cold Spring, Minnesota. After a bifurcated trial at which six expert witnesses testified regarding McLaughlin's mental health, the Stearns County District Court declined to excuse McLaughlin from criminal liability. The court found that McLaughlin knew it was morally wrong to shoot the victims and concluded that McLaughlin therefore failed to establish a mental illness defense under the M'Naghten rule codified at Minn.Stat. § 611.026 (2004). Following his conviction, McLaughlin appealed to this court. On appeal, he argues that in light of recent brain development research, the M'Naghten rule violates the Due Process Clause of the Minnesota Constitution as applied to adolescent defendants. McLaughlin also argues that the district court abused its discretion by denying a mid-trial continuance he sought in order to produce a rebuttal witness and by imposing permissive consecutive sentences for his two murder convictions. We affirm.

Appellant John Jason McLaughlin was charged in Stearns County with first- and second-degree murder in the deaths of two fellow Rocori High School students—Seth Bartell and Aaron Rollins. He was also charged with possession of a dangerous weapon on school property. The district court tried McLaughlin, who was 15 years old at the time of the murders, as an adult and found him guilty of all three counts following phase one of a bifurcated bench trial, during which the following facts were established.

On September 24, 2003, McLaughlin loaded his father's semiautomatic .22 caliber pistol, put it in a gym bag, and brought it to school with the intention to "shoot some people." Specifically, McLaughlin intended to "hurt" fellow ninth-grader Bartell, who, according to McLaughlin, was one of the students who teased him "all the time." Bartell and McLaughlin were in the same physical ed-

ucation class. Shortly before that class was to start, McLaughlin brought the gun to the boys' locker room and cocked it in the bathroom so no one would see it. He then hid the gun in his gym bag, sat on a bench, and waited for Bartell. Other students were getting ready for class in the locker room at this time. McLaughlin asked one of these students, R.S., where C.E., another student in the physical education class, was. R.S. responded that C.E. was gone that day.[1]

Shortly thereafter, R.S. left the locker room with Bartell, who had changed clothes in an area of the locker room that McLaughlin could not see. McLaughlin followed R.S. and Bartell out of the locker room and into a hallway, where he fired the gun at and hit Bartell. Bartell grabbed his left side as he and R.S. continued down the hallway toward a staircase leading to a gymnasium. Meanwhile, McLaughlin cleared a jam in the gun and reloaded it. Before Bartell and R.S. reached the stairs, McLaughlin fired a second shot in Bartell's direction; this shot missed Bartell, but hit fellow student Aaron Rollins, who was walking toward McLaughlin. Rollins raised his hands toward the wound in his neck and as he started falling, said, "[h]elp me, I'm hurt. Help me, I've been shot."

As R.S. and Bartell climbed the stairs, Bartell lifted his shirt and said to R.S., "Look, I'm shot." R.S. and Bartell continued up the stairs and into the gym, looking for their physical education teacher. Shortly thereafter, McLaughlin entered the gym and approached Bartell. When McLaughlin was approximately two feet from Bartell, who had turned to face him, McLaughlin shot Bartell a second time, this time hitting him in the forehead. Student witnesses estimated that the gun was

anywhere from one to eight inches from Bartell's head when McLaughlin pulled the trigger, but a forensic expert determined that the distance was approximately 18 inches to three feet. Bartell collapsed instantly, and McLaughlin started to walk away.

Physical education teacher Mark Johnson was completing some paperwork in the gym when McLaughlin shot Bartell the second time. As McLaughlin walked away from Bartell, Johnson stood up from his seat in the bleachers and first began to walk toward Bartell, and then toward McLaughlin. After Johnson took two or three steps toward McLaughlin, McLaughlin raised the gun and pointed it at Johnson. Johnson stopped immediately, raised his hand, and said "no" in a loud voice. McLaughlin then lowered the gun, ejected the remaining shells onto the floor, and dropped the gun. Johnson picked up the gun, grabbed McLaughlin by the wrist, and took him to the school office. Shortly thereafter, law enforcement officers arrived and transported McLaughlin to the police station.

While the officers dealt with McLaughlin, emergency response personnel attended to Bartell and Rollins. Attempts to revive Rollins through CPR were unsuccessful, and he was declared dead upon arrival at a St. Cloud hospital. Bartell underwent surgery soon after he arrived at the same hospital, but remained unconscious until his death 16 days later.

In an interview with Bureau of Criminal Apprehension (BCA) Agent Ken McDonald immediately after the shooting, McLaughlin initially admitted shooting Bartell in the basement, but moments later, he said that he thought his first shot missed Bartell. McLaughlin told Mc-

---

1. Earlier, in a third hour driver's education class, McLaughlin had asked two other students where C.E. was and whether he was in school that day.

Donald that once he reached the gym, he "shot [Bartell] again" from a distance of five to six feet. When asked where he shot Bartell, McLaughlin responded, "I don't know, I think right here," and pointed toward his shoulder. McLaughlin told McDonald that he did not think he shot anyone other than Bartell, but he acknowledged that he might have, "if [he] missed, maybe." Midway through the interview, McDonald learned that one of the victims had died. When he relayed this information to McLaughlin, McLaughlin started to cry.

McLaughlin denied wanting to kill or "seriously hurt" anybody and told McDonald that he "was just trying to hurt [Bartell] like he hurt me." He said that he did not think a .22 gun would do "very much" harm.[2] McLaughlin also told McDonald that he started thinking about bringing a gun to school approximately one week earlier. He also said that two days before the shootings he checked the school for metal detectors and security cameras. Toward the end of the interview, McDonald asked McLaughlin, "Do you think you did something wrong today?" McLaughlin replied, "[y]eah."

McLaughlin told McDonald that his trouble with Bartell began in sixth grade, and that he was teased "basically about [his] zits and stuff." Of the 12 students who testified at McLaughlin's trial, including several of McLaughlin's friends, only two told the district court that they had ever observed any conflict between Bartell and McLaughlin. The conflicts these witnesses described involved pushing, yelling, and "talking," but not Bartell calling McLaughlin names or teasing him about his acne or anything else. Two students testified that C.E. called McLaughlin

names such as "fag" and "asshole." But these witnesses qualified their testimony by stating that C.E. teased "everybody else" in the same manner, that C.E. was "just a kidding type of guy," and that the conflict between C.E. and McLaughlin was "nothing major." A third witness remembered one instance in which C.E. pushed McLaughlin out of the way by McLaughlin's locker, and McLaughlin responded by acting as if it did not happen.

The student who said he only saw Bartell and McLaughlin "talking" apparently testified to the grand jury that McLaughlin "was teased almost every day or every other day" and that "[Bartell] and his friends would go up to [McLaughlin] and they would just push him around." On cross-examination, this student agreed with defense counsel's statement that "[your grand jury testimony] was based mainly on rumors that you had heard." Another witness admitted on cross-examination that she had heard stories from other students about McLaughlin being teased, even though she never saw it happen. Defense counsel read from a statement this same witness gave to BCA agents on the day of the shooting, in which she said that McLaughlin "was a pretty good person and he got teased for a lot of things, for just a lot of things."

B.K., who knew McLaughlin since elementary school and developed a friendship with him in middle school, told the court that she exchanged e-mail messages with McLaughlin during the summer before ninth grade and after the school year started. During this time, McLaughlin told B.K. that he had a girlfriend named Suki Renoko, and he asked B.K. if she would exchange e-mail messages with Renoko. B.K. began to correspond with Re-

---

**2.** At trial, a Department of Natural Resources firearms instructor testified that McLaughlin had recently passed a firearm safety course in which the students fired a .22 caliber pistol and observed the damage caused to milk cartons 25 to 50 yards away.

noko, but she soon became suspicious that there was no such person and that Renoko was actually McLaughlin. She testified that the messages contained overly personal questions that typical 14–year–olds would not ask and had the same spelling errors as McLaughlin's messages. In one message from "Renoko," McLaughlin characterized himself as a "sniper." In another, he described an incident in which he cut the face of someone who stabbed his sister. Before classes began on the day of the shooting, McLaughlin e-mailed B.K. under his own name and wrote, "befor[e] [I] go to[o] far [I] have to ask you not to tell any one about this not the news cops or parents ok * * * so [I] guess this is goodbye my love." B.K. did not receive this message until after the shootings when she returned home from school.

Approximately six months after the shootings, the Stearns County Juvenile Court certified McLaughlin to stand trial as an adult. McLaughlin appealed the certification to the Minnesota Court of Appeals, which affirmed the certification order. The parties then agreed to a bifurcated bench trial in which McLaughlin would stipulate to guilt in the second-degree murder of Rollins during the trial's first phase and would attempt to prove a mental illness defense during the second phase. There was no stipulation as to Bartell. At the close of the first phase, the district court found McLaughlin guilty of first-degree murder in Bartell's death, second-degree murder in Rollins' death, and possession of a dangerous weapon on school property. In the second phase, the court heard testimony from six mental health experts—three retained by McLaughlin, one by the state, and two by the court.

### McLaughlin's Experts

McLaughlin's first expert witness was Dr. Maureen Hackett, a forensic psychiatrist. Hackett was retained by the defense to evaluate whether McLaughlin was competent to stand trial and whether he qualified for a mental illness defense.[3] Hackett diagnosed McLaughlin with "a severe thought disorder best described as schizophrenia, paranoid and disorganized type" and also with "cognitive impairments."

Hackett told the district court that McLaughlin began hearing a voice starting in sixth grade, and that he attributed the voice to Bartell teasing him. She said that while McLaughlin was confined at the Prairie Lakes Youth Programs facility following the shootings and during his certification hearing, he began to associate the voice with a visual hallucination—a person he ultimately called "Jake."[4] Hackett told the court that it is common for children with schizophrenia to experience visual hallucinations.

Hackett described McLaughlin as "becoming pretty isolated" in sixth grade, which is consistent with the "socially avoidant" behavior of schizophrenics. She said that one of the causes of this socially avoidant behavior is egocentrism, or being "within [one's] own head"—a quality she

---

3. In Minnesota, a defendant seeking to establish a mental illness defense must meet the M'Naghten standard codified at Minn.Stat. § 611.026 (2004). See Bruestle v. State, 719 N.W.2d 698, 704 (Minn.2006). The defendant must prove that at the time he committed the charged offense, he "was laboring under such a defect of reason, from a mental illness or deficiency, as not to know the nature of the act, or that it was wrong." Id. (brackets omitted); see also State v. Martin, 591 N.W.2d 481, 486 (Minn.1999).

4. Later in the trial, Prairie Lakes Program Director Bradley Bengtson testified that during the approximately 17 months McLaughlin resided at the facility, there were no reports of "unusual behavior" by McLaughlin.

observed in McLaughlin. She explained that McLaughlin's excessive egocentrism led him to develop a "grandiose view of himself," as reflected in his "sharpestshot 290@[——].com" e-mail address, the Suki Renoko messages, and stories McLaughlin made up to "make himself look better than what he was."

According to Hackett, McLaughlin told her that Bartell teased him a "very great amount of time, * * * somewhere around 60 times just in eighth grade and beginning of ninth," and that the teasing centered on McLaughlin's acne and possibly on his height. But Hackett "found that * * * [McLaughlin's] perception of being teased was way outside of the reality of what other people had said," given that "there [were] very few statements of anyone even seeing him being teased." Hackett characterized the teasing McLaughlin described as "a persecutory delusion," symptomatic of schizophrenia. In her report, which was introduced into evidence, Hackett concluded:

> At the time of his actions and as a direct result of his mental illness, Jason McLaughlin suffered a defect of reasoning and a serious distortion of reality so that he did not know the nature of his act.
>
> * * * *
>
> It is my opinion that Jason McLaughlin did not know the nature of the act constituting the offense for which he is charged and thus he did not appreciate and he did not know the wrongfulness of his actions on September 24, 2003.

McLaughlin's second expert was Dr. Richard Lentz, a psychiatrist. Lentz told the court that he was retained by McLaughlin's family to treat McLaughlin while he was being held at Prairie Lakes, but not to conduct a forensic evaluation. Lentz said that he diagnosed McLaughlin with schizophrenia, predominantly paranoid, and that McLaughlin's Minnesota Multiphasic Personality Inventory test results were "overwhelmingly compatible" with that diagnosis. He said that McLaughlin suffered from delusions, including a delusion that "Bartell was trying to make himself look good * * * by making [McLaughlin] look bad," as well as an olfactory hallucination of metal, and visual and auditory hallucinations involving Jake.[5] Lentz stated that he prescribed medication to McLaughlin to treat the schizophrenia, and that after McLaughlin started on the medication, his hallucinations decreased. Lentz also told the court "it would be virtually impossible [for McLaughlin] to malinger" his hallucinatory symptoms.[6] Lentz offered no opinion on whether McLaughlin would meet the M'Naghten standard.

McLaughlin's third and final expert was Dr. James Gilbertson, a forensic psychologist, whom McLaughlin retained to evaluate whether he should be certified as an adult. Gilbertson told the court that at the time of certification, he diagnosed McLaughlin with a psychotic disorder, not otherwise specified because McLaughlin's symptoms were not sufficiently longstanding to support a more specific diagnosis. Gilbertson said that he subsequently concluded that McLaughlin was a paranoid schizophrenic. He testified that McLaughlin's mental illness "robbed him of good insight, compromised his judgment, prevented him from looking at other

---

5. One delusion McLaughlin reported to several mental health examiners involved his interactions in a wooded area with a group of people working to prevent the trafficking of methamphetamine.

6. To malinger is "[t]o feign illness or disability, esp. in an attempt to avoid an obligation." *Black's Law Dictionary* 970 (7th ed.1999).

options, [and] reduced his impulse control"—and that but for his mental illness, McLaughlin would not have committed the shootings. Gilbertson also stated that McLaughlin's inability "to adequately control his behavior at the time [of the offenses]" may have helped McLaughlin "defen[d] against culpability" in some states. But in relation to the M'Naghten test, Gilbertson said, "the totality [of the evidence] convinces me that [McLaughlin] was aware of the nature of his act, the outcome of his act, and that it was morally wrong."

*State's Expert*

Dr. Katheryn Cranbrook, a forensic psychologist, testified for the state. The state retained Cranbrook to evaluate McLaughlin for the certification process and, later, to evaluate whether McLaughlin met the M'Naghten standard. Cranbrook told the court that at the time of certification, she diagnosed McLaughlin with an emerging psychotic illness—specifically—"psychotic disorder not otherwise specified"—because his symptoms did not meet the diagnostic criteria for schizophrenia. But when she met with McLaughlin approximately 19 months later to conduct the M'Naghten evaluation, she said McLaughlin "actually looked much better," and she would not have expected to see such improvement with someone suffering from a psychotic disorder—particularly McLaughlin, who had stopped taking antipsychotic medications approximately four months before she evaluated him the second time. Cranbrook said that in her opinion, at the time of the M'Naghten evaluation, McLaughlin was suffering from a major depressive disorder and, likely, an emerging personality disorder.

As to some of the symptoms observed by other experts, Cranbrook told the district court that McLaughlin was malingering. She stated that the onset of schizophrenia at McLaughlin's age was uncommon, that "positive" symptoms such as hallucinations—which are well known as easy to feign—generally appear after a group of "negative" symptoms that McLaughlin did not display, and that a notable discrepancy occurred between the symptoms McLaughlin reported and the behavior others observed.

Cranbrook concluded, to a reasonable degree of psychological certainty, that McLaughlin knew the nature of his criminal acts and knew that the acts were legally and morally wrong. She based these conclusions on the facts that, among other things, McLaughlin had completed firearms training and knew that weapons were dangerous, he expected to be charged with assault with a deadly weapon, and he did not want his parents present during the interview with BCA Agent McDonald because he was worried they would be upset with or angry at him.

*Rule 20 Examiners*

Dr. Michael Koch and Dr. Kelly Wilson completed a combined Rule 20.01/20.02 evaluation of McLaughlin.[7] Koch, a psychiatrist, testified that his role was to determine whether McLaughlin was competent to stand trial. Koch said he diagnosed McLaughlin with a depressive disorder in remission and an emerging personality disorder. He said that while other mental health professionals diagnosed McLaughlin as schizophrenic, Koch rejected this diagnosis for several reasons: (1) McLaughlin's mental health appeared to improve steadily after

---

**7.** If a court determines that there is reason to doubt a defendant's competency to stand trial, it must order an examination under Minn. R.Crim. P. 20.01, subd. 2(3). If a defendant notifies the prosecutor of his intent to assert a mental illness defense, the court may order an examination under Minn. R.Crim. P. 20.02, subd. 1.

McLaughlin stopped taking antipsychotic and antidepressant medications; (2) staff at the St. Peter Security Hospital—where McLaughlin resided for 55 days during the Rule 20 evaluation period—did not see any evidence of psychotic behavior; and (3) McLaughlin's self-reported auditory, visual, and tactile hallucinations were inconsistent with the typical experience of schizophrenic patients. Koch also testified that he thought it was likely that McLaughlin was malingering.

Dr. Wilson, a forensic psychologist, evaluated McLaughlin to determine whether he met the M'Naghten standard. She told the court that she agreed with Koch's diagnosis that McLaughlin was suffering from a major depressive disorder in remission and an emerging personality disorder. She said that to a reasonable degree of psychological certainty, she believed that McLaughlin knew the nature of his criminal acts at the time he committed them. The "plethora of evidence" Wilson cited to support her conclusion included McLaughlin's statement after the offenses that he intended to "shoot some people"; his identification of particular targets he "felt deserved to be wounded"; and his awareness of the dangers of a loaded gun, as revealed by his efforts to "make sure the weapon didn't discharge prematurely." Wilson also cited the fact that McLaughlin never denied knowing what he was doing.

Dr. Wilson further testified that to a reasonable degree of psychological certainty, she believed that McLaughlin knew the legal and moral wrongfulness of his criminal acts. With regard to legal wrongfulness, Wilson cited McLaughlin's assumption before the shootings occurred that he would be charged with assault with a deadly weapon. Wilson also told the district court that McLaughlin reported thinking about going to jail and concluding, based on television shows he had seen, that it

"would[n't] be that bad." Finally, Wilson cited the e-mail McLaughlin wrote to B.K. on the morning of the shootings, in which he asked her not to speak to people. As to evidence that McLaughlin knew the moral wrongfulness of his acts, Wilson cited "a big disconnect between the severity of the actions [McLaughlin] chose to do compared to what his perceived problem was," and her assessment that "from what [she] had] seen and * * * gathered from [McLaughlin]," McLaughlin "definitely had instilled in him a strong moral framework."

After six days of testimony in the mental illness phase of McLaughlin's trial, the district court concluded that McLaughlin could not be excused from responsibility for the crimes he committed because he "had cognitive awareness that shooting the victims was morally wrong." The court based its conclusion on the following findings, among others:

> The expert witnesses disagreed about the nature of [McLaughlin's] mental impairment, if any, on September 24, 2003. Only one expert expressed an opinion that [McLaughlin] had a mental illness that was so severe as to meet the M'Naghten standard. However, the Court does not attach weight to that opinion in light of the undisputed evidence of [McLaughlin's] acts in September of 2003, as well as [McLaughlin's] statement to Agent Ken McDonald immediately following the shooting.

At the end of a sentencing hearing that included expert testimony on bullying, the district court imposed a life sentence for the death of Bartell, to be served consecutively with a 144–month sentence for the death of Rollins. Citing *State v. Warren*, the court concluded that the mitigating and aggravating factors "balance each other" and that consecutive sentences were "proportional to other sentences given for

similar conduct." 592 N.W.2d 440, 452 (Minn.1999). Following his trial, McLaughlin appealed his convictions and sentences to our court.

## I.

McLaughlin's first claim on appeal is that the M'Naghten rule violates the Due Process Clause of the Minnesota Constitution as applied to adolescent defendants. The M'Naghten rule is codified at Minn.Stat. § 611.026 (2004), which provides, in relevant part:

> [A] person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong.

See State v. Finn, 257 Minn. 138, 140, 100 N.W.2d 508, 510–11 (1960) (recognizing the codification of the M'Naghten rule). The constitutionality of a statute is a question we review de novo. State v. Barnes, 713 N.W.2d 325, 330 (Minn.2006). A party who challenges a statute's constitutionality bears the burden of proving that the statute is unconstitutional beyond a reasonable doubt. See State v. Tennin, 674 N.W.2d 403, 407 (Minn.2004).

McLaughlin argues that on the basis of recent brain development research, the application of section 611.026 to adolescents violates the Due Process Clause of the Minnesota Constitution. Specifically, he

contends that because adolescents' brains are less developed than adults' brains in "regions related to impulse control, risk assessment, and moral reasoning," adolescents "may understand their actions or know that they are wrong, but still be unable to control [their] behavior[ ]." In support of this contention, McLaughlin cites a brief filed by amici curiae American Medical Association, et al. in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the execution of defendants for offenses they committed before age 18 is unconstitutional). Brief of the Am. Med. Ass'n et al. as Amici Curiae in Support of Respondent, Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (No. 03–633). Based on the information in this amicus brief to the United States Supreme Court, McLaughlin urges us to adopt one of three alternative tests to M'Naghten for determining the legal insanity of adolescents— including a test that would apparently recognize the unique vulnerability of young persons to the "irresistible impulse." [8]

The state argues as a preliminary matter that McLaughlin's M'Naghten claim is procedurally barred because McLaughlin has raised this claim for the first time on appeal. The state asserts that although McLaughlin raised a due process challenge to section 611.026 in the district court, that challenge was grounded on vagueness, which is substantively different from the basis McLaughlin now asserts—namely, that section 611.026 is unfair to adolescent

---

8. The "irresistible impulse" test holds "that a person is not criminally responsible for an act if mental disease prevented that person from controlling potentially criminal conduct." Black's Law Dictionary 835 (7th ed.1999). "The few jurisdictions that have adopted this test have combined it with the McNaghten rules." Id. We note that our court has consistently rejected arguments that M'Naghten must give way to a test that recognizes the power of the "irresistible impulse." See, e.g.,

State v. Schreiber, 558 N.W.2d 474, 479 (Minn.1997); State v. Rawland, 294 Minn. 17, 46, 199 N.W.2d 774, 790 (1972); Finn, 100 N.W.2d at 511. Yet, in Rawland, we held that a defendant is permitted to introduce evidence regarding his vulnerability to "irresistible impulses," and a factfinder may consider this evidence in determining whether a defendant meets the M'Naghten standard. 294 Minn. at 43–46, 199 N.W.2d at 789–90.

defendants because it fails to account for the ways in which their brains differ from the brains of adults. McLaughlin acknowledges that he raises the brain development claim for the first time on appeal, but argues that we should review it in the interests of justice and in light of recent medical research.

We have held that a party cannot challenge the constitutionality of a statute for the first time on appeal. *State v. Schleicher*, 672 N.W.2d 550, 555 (Minn.2003). In *Schleicher*, we concluded that we were procedurally barred from reviewing a defendant's constitutional challenge to section 611.026 based on vagueness because the defendant had not raised the issue in the district court. *Id.* We declined to make an exception to that procedural bar or to consider the claim in the interests of justice because the record was insufficiently developed as to the "particular concern" the defendant raised on appeal. *Id.* at 555–56 n. 10. Here, we decline to make an exception to the procedural bar and to consider McLaughlin's M'Naghten claim in the interests of justice for the same reason. The validity of McLaughlin's claim depends entirely on highly technical facts which were never raised before the district court. Moreover, the evidence McLaughlin supplies on appeal—in the form of a single amicus brief from an unrelated Supreme Court case—is not targeted to the "particular concern" McLaughlin raises, that is, the implications of recent brain development research for the constitutionality of the M'Naghten rule.[9] Because

McLaughlin did not develop a factual record in the district court on the issue he raises and because the *Roper* brief cannot substitute for such a record in this case, we hold that it would not serve the interests of justice for us to consider, on this record, striking the longstanding M'Naghten rule as unconstitutional.[10]

## II.

■■■ We next turn to McLaughin's claim that the district court abused its discretion by denying him a mid-trial continuance to procure an expert witness—Dr. Roger Carten. The decision to grant or deny a continuance lies within the discretion of the district court. *Barnes*, 713 N.W.2d at 333. We will not reverse the court's decision unless the defendant shows that the denial of a continuance prejudiced him by materially affecting the outcome of the trial. *Id.*

Dr. Carten was the court-appointed examiner for the adult certification phase of McLaughin's court proceedings. McLaughlin subsequently attempted to secure Carten's appearance for the mental illness phase of the trial, but Carten told McLaughlin he would be out of the country during that part of the trial. Apparently McLaughlin did not seek a subpoena to compel Carten's appearance. Rather, three days after the state rested its case in the trial's mental illness phase and after informing the court he would only be calling Dr. Hackett on rebuttal, McLaughlin moved for a continuance.

---

9. The question the *Roper* amici addressed was whether "the execution of an offender who committed the crime at the age of 16 or 17 constitute[s] cruel and unusual punishment in violation of the Eighth Amendment." Brief for Am. Med. Ass'n, *supra,* at i.

10. Although the M'Naghten rule has been "defended, supported, condemned, and reviled," it has served as the legal test of insani-

ty in Minnesota since 1868. *Rawland,* 294 Minn. at 31–35, 199 N.W.2d at 782–84. And despite the criticism our court has sometimes directed toward aspects of the M'Naghten rule, we have stated unambiguously that any changes to M'Naghten must come from the legislature. *Schleicher v. State,* 718 N.W.2d 440, 448 n. 7 (Minn.2006); *Finn,* 257 Minn. at 141–42, 100 N.W.2d at 511.

During the mental illness phase, two expert witnesses—Drs. Cranbrook and Wilson—suggested that Dr. Carten might have inadvertently cued McLaughlin to malinger an olfactory hallucination symptom when Carten asked a leading question in an interview. As a direct result of this testimony, McLaughlin sought a continuance to procure Carten so he could (1) rebut the malingering suggestions; (2) clarify "how the issue of [McLaughlin's] mental illness was first raised"; (3) provide opinions on when McLaughlin first started hearing voices and whether the voices played a role in the shootings; and (4) testify that the shootings would not have occurred "but for" McLaughlin's illness. The district court declined McLaughlin's continuance request on the grounds that Carten's testimony was

> perhaps not appropriate rebuttal. But even to the extent it would be, I think it would be cumulative and repetitive * * *. And since it's never been the court's understanding that Doctor Carten would opine that the defendant's condition would support a M'Naghten defense, I don't think that it's particularly helpful.

On appeal, McLaughlin asserts that he is entitled to a new trial because "Dr. Carten's testimony was important to [his] burden of establishing his mental illness defense" and the district court "abused its discretion by rejecting the short delay."

Based on a review of the record, we conclude that the district court did not abuse its discretion when it denied the continuance. Specifically, we conclude that Carten's testimony would not have materially affected the outcome of McLaughlin's trial with respect to the M'Naghten issue. *See Barnes,* 713 N.W.2d at 333. First, given the breadth and depth of the expert testimony in this case, the suggestions by Cranbrook and Wilson that Carten's interview technique *might* have cued McLaughlin to report an unusual hallucinatory symptom were not particularly significant. Moreover, McLaughlin effectively cross-examined Cranbrook and Wilson regarding their perceptions of Carten's technique. Second, the district court could reasonably find, given an already extensive record, that further testimony on the issues of (1) how McLaughlin's mental illness was first raised; (2) when McLaughlin first started hearing voices; and (3) whether the voices played a role in the shootings, would be cumulative. *See Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 725 (Minn.1983) ("[R]ulings on * * * the cumulative nature of the evidence are committed to the sound discretion of the trial judge and will only be the basis for reversal where that discretion has been clearly abused."). Finally, Dr. Gilbertson had already expressed the opinion that the shootings would not have occurred "but for" McLaughlin's mental illness, and this opinion is not particularly relevant to the M'Naghten standard.

McLaughlin provides no specific basis to support a conclusion that Dr. Carten's testimony would have materially affected the district court's M'Naghten finding beyond his general assertion that Carten's testimony was "important" to his defense. Moreover, it is difficult to believe that McLaughlin would not have compelled Carten's appearance in his case in chief if Carten's testimony were as potentially influential as McLaughlin now contends. For all of the foregoing reasons, we hold that the district court did not abuse its discretion in denying McLaughlin's request for a continuance.

### III.

McLaughlin's final claim is that the district court abused its discretion by imposing consecutive sentences, rather

than concurrent sentences. At the time McLaughlin committed the murders, consecutive sentences were permissive and did not depart from the Minn. Sent. Guidelines for defendants convicted of multiple current felonies against persons. Minn. Sent. Guidelines II.F.2 (2004).[11] We will not reverse a district court's imposition of consecutive sentences absent a clear abuse of discretion. *State v. Blanche*, 696 N.W.2d 351, 378 (Minn.2005) (citing *Neal v. State*, 658 N.W.2d 536, 548 (Minn.2003)). Generally, we "will not interfere with a trial court's discretion in sentencing unless the sentence is disproportionate to the offense" or "unfairly exaggerates the criminality of the defendant's conduct." *State v. Sanchez–Diaz*, 683 N.W.2d 824, 837 (Minn.2004) (quotations omitted). We are "also guided by past sentences imposed on other offenders." Warren, 592 N.W.2d at 451. Finally, we have "consistently affirmed the imposition of consecutive life sentences where a defendant was convicted of multiple victim homicides." *State v. Wilson*, 539 N.W.2d 241, 246 (Minn.1995).

McLaughlin asserts that the district court abused its discretion by imposing consecutive sentences because the resulting punishment is disproportionate to his culpability. In particular, he contends that the court failed to give sufficient weight to three factors tending to reduce his culpability: his youth, his alleged victimization through "constant bullying," and his mental illness. The state argues in response that consecutive sentencing comports with case law involving similar crimes and defendants, and is commensurate with McLaughlin's culpability in light of relevant mitigating and aggravating factors.

In imposing consecutive sentences, the district court stated that it considered concurrent sentences, but construed our decision in *Warren* to require consecutive sentences given that (1) the aggravating and mitigating factors in McLaughlin's case "in a sense balance each other"; and (2) consecutive sentences would result in a punishment "proportional to other sentences given for similar conduct." The court identified three mitigating factors: McLaughlin's age when he committed the offenses, his "hypersensitivity to perceived slights of others," and his mental health. As to aggravating factors, the court noted that the shootings occurred in a school, where the victims "had a reason to feel safe and secure," "the fact that the gun was fired in such a dangerous manner, and the impact [the shootings] had on the community."

In *Warren*, we concluded that a district court abused its discretion when it imposed concurrent sentences on a defendant who shot and killed three victims. 592 N.W.2d at 452. We determined that concurrent sentences were not commensurate with Warren's culpability given "severe aggravating factors" that the court apparently failed to consider, notwithstanding several mitigating factors—including lack of criminal history, youth, and "a degree of provocation." *Id.* The aggravating factors in *Warren* included the three victims' inability to defend themselves, the fact that two victims were shot twice because the first shots did not kill them, and strong evidence that Warren acted in a deliberate and calculating manner. *Id.*

In light of *Warren* and several other cases upholding consecutive sentences, it does not appear that the district court

---

11. Minnesota Sentencing Guidelines II.F.2 was modified in 2005 to provide that consecutive sentences were permissive for defendants convicted of certain enumerated felonies. But this modification does not apply to McLaughlin because his offenses predate the modification effective date. *See* Minn. Sent. Guidelines III.F.

abused its discretion here. The court considered three mitigating factors relevant to McLaughlin's sentencing, but two of these—youth and mental illness—have also been factors in numerous cases in which we have upheld comparable sentencing. For example, in two cases involving adolescent defendants who committed particularly callous murders, we were unwilling to use the defendants' youth as a basis for reversing the imposition of consecutive sentences. *See State v. Ouk*, 516 N.W.2d 180, 186 (Minn.1994) (upholding consecutive sentences for 15–year–old who shot four victims at close range when none offered any resistance); *State v. Brom*, 463 N.W.2d 758, 765 (Minn.1990) (upholding consecutive sentences for 16–year–old who killed four family members with an ax). McLaughlin shot two fellow students, one of them twice and at close range. Both students were defenseless. McLaughlin planned and carried out the shootings in a methodical manner, and minutes after the shootings occurred, he acknowledged to Agent McDonald that he knew what he did was wrong.

 As to mental illness, we have held that in order to constitute a mitigating factor in sentencing, a defendant's impairment must be "extreme" to the point that it deprives the defendant of control over his actions. *See Wilson*, 539 N.W.2d at 247. In *Wilson*, we upheld consecutive sentences for a defendant who failed to prove that he lacked the ability to control his actions, despite one expert's opinion that the defendant was a paranoid schizophrenic and four experts' opinions that the defendant had some sort of personality disorder. *Id.* at 244–45, 247. In *Carpenter v. State*, we concluded that consecutive sentencing was not an abuse of discretion

despite evidence that the defendant checked himself into a mental health facility, made several suicide attempts in the months before he committed two murders, and was using the prescription drug Paxil. 674 N.W.2d 184, 189–90 (Minn.2004). But, in *State v. Martinson*—a case McLaughlin cites—the court of appeals upheld a *downward* durational departure where "expert psychological evidence [was] uncontroverted that, at all relevant times," the defendant suffered paranoid schizophrenia that frequently manifested itself in delusions and "wholly irrational" behavior. 671 N.W.2d 887, 891–92 (Minn.App.2003), *rev. denied* (Minn. Jan. 20, 2004).

McLaughlin's case is more like *Wilson* and *Carpenter* than *Martinson* in the sense that his mental impairment appears insufficiently "extreme" to be a mitigating factor in sentencing. Of the six mental health experts who testified at McLaughlin's trial, three diagnosed him with paranoid schizophrenia and the other three diagnosed him with a major depressive disorder in remission and an emerging personality disorder. There was no consensus that McLaughlin frequently suffered delusions and engaged in wholly irrational behavior, despite the broad agreement that McLaughlin's mental health was compromised to some degree. The district court found that although McLaughlin "was suffering from some sort of mental impairment" at the time of the shootings, that impairment—when viewed *in the light most favorable to McLaughlin*—was only a "subtle form of schizophrenia" and was not an "extreme mental illness." Our review of the record as a whole confirms that the court's finding is supported by the evidence.[12]

---

12. McLaughlin also cites *State v. Wall*, 343 N.W.2d 22 (Minn.1984), to support his argument that he should have received concurrent sentences in light of his mental illness. But *Wall* is not especially helpful to McLaughlin. In *Wall*, we concluded that an *upward dura-*

Finally, there is the potentially mitigating factor that McLaughlin describes as his victimization through "constant bullying" and "daily abuse," and that the district court described as his "hypersensitivity to perceived slights of others." Unfortunately, the record is far from clear regarding the extent of the teasing or bullying McLaughlin actually experienced. As previously stated, the evidence adduced at McLaughlin's trial does not support McLaughlin's characterization of himself as the victim of constant bullying and daily abuse. But some self-reports by McLaughlin, as well as some statements by fellow students to Agent McDonald and the grand jury, suggest that McLaughlin was a frequent target of hurtful behavior by classmates. Further complicating the picture is one expert's opinion that McLaughlin's over-sensitivity caused him to perceive the teasing as more severe than it was, and another expert's description of McLaughlin as having a "persecutory delusion" with regard to teasing. A fair conclusion is that McLaughlin did experience teasing or bullying, but it is unclear on this record how far that teasing or bullying was outside the range of what many persons experience at some period during adolescence.

We conclude that none of the three mitigating factors McLaughlin asserts—youth, mental illness, or teasing and bullying—alone or collectively—support a conclusion that the district court abused its discretion by imposing consecutive sentences. On the basis of the aggravating and mitigating factors and sentences imposed in comparable cases, we hold that the consecutive sentences the court imposed on

McLaughlin comport with those we have "consistently affirmed * * * [for defendants] convicted of multiple victim homicides." *Wilson,* 539 N.W.2d at 246.

Affirmed.

---

*tional departure* was not appropriate for a defendant who had suffered from paranoid schizophrenia for many years and who strangled his wife, on whom he focused much of his paranoia. *Id.* at 23–25. Wall's mental

impairment and the direct relationship between that impairment and the crime he committed were apparently "clear from the record," which is not the case here. *See id.* at 25.